ATTORNEY FOR APPELLANT
Mark A. Bates
Office of the Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Kelly A. Miklos
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

FILED
May 20 2015, 9:35 am

CLERK
of the supreme court,
court of appeals and
tax court

No. 45S00-0803-DP-125

KEVIN CHARLES ISOM,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Lake Superior Court, No. 45G04-0708-MR-00008
The Honorable Thomas P. Stefaniak, Jr., Judge

On Direct Appeal

**May 20, 2015**

**Rucker, Justice.**

## Case Summary

After a trial by jury Kevin Charles Isom was found guilty of three counts of murder for which the jury recommended and the trial court imposed a death sentence. In this direct appeal Isom raises the following rephrased issues: (1) did the trial court err by denying Isom's for-cause challenges to certain prospective jurors; (2) did the trial court err in denying Isom's motions for mistrial; (3) did the trial court abuse its discretion in instructing the jury; (4) did the trial court err by refusing to allow a witness to answer a question posed by a juror; (5) did the State commit prosecutorial misconduct during closing arguments in the penalty phase of trial; (6) is revision of Isom's death sentence warranted; and (7) did the trial court issue an illegal or void sentence. We affirm Isom's conviction and death sentence, but remand with instructions to issue a new sentencing order consistent with this opinion.

## Facts and Procedural History

On the evening of August 6, 2007, police officers were dispatched to the Lakeshore Dunes Apartments in Gary, Indiana after reports of repeated gunfire rang out in the complex. Unable to identify immediately the source of the gunfire or enter the apartment building to investigate, the officers were held at bay while the assailant shot rounds of gunfire in their direction. After several hours, a SWAT team gained entry into the apartment. Once inside, the officers found Isom sitting on the floor in the back bedroom leaning against the wall, and reaching underneath a sheet and moving his hands about. Isom did not comply with police commands to show his hands, and after a brief struggle officers placed him in handcuffs. A .357 Magnum handgun fell from Isom's waistband. Nearby, officers discovered a .40 caliber Smith & Wesson handgun, a 12-gauge shotgun, and multiple rounds of ammunition. The officers also located the bodies of Isom's wife Cassandra Isom, Isom's thirteen-year-old stepdaughter Ci'Andria Cole, and Isom's sixteen-year-old stepson Michael Moore. Cassandra was killed by a close-range shotgun blast to the top of her head. She had also been shot with the Smith & Wesson handgun. Ci'Andria was shot with the Magnum, the Smith & Wesson, and the shotgun. Michael was killed by a shotgun blast to his chest and flank area, probably while sitting at a computer. And he was also shot with the Smith & Wesson handgun. Blood from all three

victims was found on Isom's clothing. Isom was arrested and the next day, after being read his Miranda[1] warnings, gave a statement to police which included an account of his activities during the course of the day and an explanation of where the victims were positioned when they were shot. At times Isom seemed not to remember the shootings, declaring at one point, "I can't believe I killed my family, this can't be real." Tr. at 12616.

The State charged Isom with three counts of murder for the shooting deaths of Cassandra, Ci'Andria, and Michael, and sought the death penalty alleging as a statutory aggravating circumstance the multiple murders. See Ind. Code § 35-50-2-9(b)(8) (2007).[2] The State also charged Isom with four counts of attempted murder in connection with his firing at police officers. Prior to trial the State dismissed one of the attempted murder counts. After several delays, Isom's jury trial began November 26, 2012 and the guilt phase concluded February 5, 2013. Isom was found guilty of murder as charged. The jury also found Isom guilty of three counts of criminal recklessness as lesser included offenses of attempted murder. The following day the jury reconvened for the penalty phase of trial, after which the jury found that Isom intentionally killed Cassandra, Ci'Andria, and Michael, and that the State proved the charged aggravator beyond a reasonable doubt. The jury also found that Isom's proffered mitigating circumstances were outweighed by the charged aggravator. The jury thus recommended a sentence of death for each of the three murder convictions. The court accepted the jury's recommendations and sentenced Isom to three death sentences to be served consecutively.[3] Pursuant to Indiana Appellate Rule 4(A)(1)(a), this Court has mandatory and exclusive jurisdiction over this appeal. Additional facts are set forth below as necessary.

---

[1] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

[2] Specifically, the statute provides: "The defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder." I.C. § 35-50-2-9(b)(8). This aggravator is applicable only in "cases involving double or multiple murders for which the defendant is being tried in one proceeding." Hough v. State, 560 N.E.2d 511, 519 (Ind. 1990).

[3] The trial court also sentenced Isom to an aggregate term of three years for the criminal recklessness convictions. Giving Isom credit for time served in pre-trial confinement, the trial court noted this was in excess of the sentences imposed and thus considered the sentences for criminal recklessness already served. In this appeal Isom does not challenge his convictions or sentences for these offenses.

3

## Discussion

## I.    Challenges for Cause

Isom contends the trial court erred in failing to grant his for-cause challenges of certain prospective jurors. The essential facts follow. On motion of the defense team, the trial court awarded both sides thirty peremptory challenges (more than the twenty contemplated by Indiana Jury Rule 18). See App. at 407-09, 479. In advance of jury selection each prospective juror was provided a detailed forty-five page jury questionnaire. During a fifteen-day *voir dire* proceeding each prospective juror was questioned extensively by the State, the defense, and the trial court. Isom moved to strike numerous jurors for cause. The trial court granted some of the motions but denied the motions with respect to twelve jurors, specifically Jurors No. 8, 31, 44, 57, 100, 105, 114, 168, 246, 375, 391, and 398. By the time eleven jurors had been seated, Isom had exhausted all of his peremptory challenges, so he had none left when the trial court denied his for-cause challenge to Juror No. 398. That person was seated as the twelfth juror. Isom claims error with the seating of this juror as well as the denial of his eleven other for-cause challenges which compelled him to remove those jurors by use of peremptory challenges. See Whiting v. State, 969 N.E.2d 24, 29-30 (Ind. 2012) (declaring appellate review of alleged trial court error in the denial of a challenge for cause is available where a defendant has exhausted all of his peremptory challenges).

Challenging jurors for cause is the primary means by which a defendant may exclude any prospective juror whose "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath[.]" Oswalt v. State, 19 N.E.3d 241, 246 (Ind. 2014) (quoting Wainwright v. Witt, 469 U.S. 412, 433 (1985) (internal quotation omitted)). These challenges "must be supported by specified causes or reasons that demonstrate that, as a matter of law, the venire member is not qualified to serve." Whiting, 969 N.E.2d at 29 (quoting Gray v. Mississippi, 481 U.S. 648, 652 n.3 (1987) (citation omitted)). We review a trial court's denial of a defendant's for-cause challenge for an abuse of discretion. Oswalt, 19 N.E.3d at 245. "[T]he trial court has 'a broad discretion and duty . . . to see that the jury as finally selected is subject to no solid basis of objection on the score of impartiality.'" Whiting, 969 N.E.2d at 29 (omission in original) (quoting Frazier v. United States, 335 U.S. 497, 511 (1948)).

4

We afford substantial deference to the trial court's ruling and will reverse only upon a showing that the decision is illogical or arbitrary. Id.

Isom's challenges to the twelve jurors fall within three broad categories: (1) the prospective juror would not consider mitigation evidence during the penalty phase of trial; (2) the prospective juror would not give serious consideration to all three penalty options—death, life without parole, or a term of years; and (3) the prospective juror failed to understand legal concepts relevant to the case. We address these challenges in turn.

## A. *Refusal to consider mitigation*

Isom challenged Jurors No. 8, 31, 375, 391, and 398 contending that they would not consider mitigation evidence. The record shows that each of these jurors initially expressed skepticism either on the jury questionnaire or during *voir dire* itself. But their positions changed after further explanation and inquiry, especially by the trial court. In each instance the trial court explained the manner in which mitigation evidence would be introduced, the reason for the mitigation evidence, and the juror's obligation to consider that evidence. See Tr. at 1638-66 (Juror No. 8); Tr. at 1856-1910 (Juror No. 31); Tr. at 5643-5717 (Juror No. 375); Tr. at 6030-68 (Juror No. 391); Tr. at 6101-43 (Juror No. 398). It is certainly the case that "[a] juror who will automatically vote for [a particular] penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Ward v. State, 903 N.E.2d 946, 955 (Ind. 2009) (quoting Morgan v. Illinois, 504 U.S. 719, 729 (1992)), adhered to on reh'g, 908 N.E.2d 595, 597 (Ind. 2009). However, "a constitutionally impartial juror is one who is able and willing to lay aside his or her prior knowledge and opinions, follow the law as instructed by the trial judge, and render a verdict based solely on the evidence presented in court." Whiting, 969 N.E.2d at 28 (citing Irvin v. Dowd, 366 U.S. 717, 722-23 (1961)). In this case, it was only after assuring itself that the potential juror fully understood his/her duty as explained by the court and genuinely believed that he/she could fulfill such a duty that the trial court denied Isom's challenges for cause predicated on the jurors' alleged refusal to consider mitigation evidence. Isom's claim of error essentially amounts to a request for this Court to reweigh the credibility of the jurors' declarations. We decline. Credibility determinations lie within the province of the trial court. Cf. Oswalt, 19 N.E.3d at 245

5

("Selecting impartial juries depends upon the parties' discernment and the trial court's discretion to select a panel of objective and unbiased jurors 'who will conscientiously apply the law and find the facts.'" (quoting Witt, 469 U.S. at 423)). And we will not disturb that finding absent a showing that the trial court's determination was illogical or arbitrary. Whiting, 969 N.E.2d at 29. We find no such showing in this instance.

## B. *Failure to consider all three penalty options*

Isom next contends the trial court also improperly failed to dismiss Jurors No. 57, 100, 105, 114, 168, 246, 391, and 398 because, according to Isom, these jurors "fail[ed] to give meaningful consideration to all three penalty options . . . ." Br. of Appellant at 17. In each instance the trial court explained that should the jury return a verdict of guilty of murder, the jury would be reconvened for the penalty phase of trial, and that the available options were death, life imprisonment without parole, or a term of years. See Tr. at 2014-15 (Juror No. 57); Tr. at 2749-51 (Juror No. 100); Tr. at 3527-28 (Juror No. 105); Tr. at 3801-02 (Juror No. 114); Tr. at 4102-04 (Juror No. 168); Tr. at 4751-52 (Juror No. 246); Tr. at 6015-16 (Juror No. 391); Tr. at 6091-92 (Juror No. 398).

It is true that each of the challenged prospective jurors initially expressed an inclination towards one option over the other. However, the transcript of *voir dire* clearly reflects that each of these individuals stated that he/she would follow the court's instructions and consider all of the testimony as well as the three penalty options. See, e.g., Tr. at 2063 (Juror No. 57 explaining, "[she] would be willing to change [her] opinion if [she] thought that maybe it was not quite as [she] originally thought"); Tr. at 2750 (Juror No. 100 affirming, "yes," when asked if she would be "able to give full and fair consideration to all three of those as a potential penalty"); Tr. at 3528 (Juror No. 105 answering, "[y]es, I could," when asked if he was "able to consider all three of those as a potential penalty"); Tr. at 3802 (Juror No. 114 affirming that he could "give meaningful consideration to all of those"); Tr. at 4103-04 (Juror No. 168 confirming that he "would [neither] automatically just dismiss" nor "just automatically impose" "any of those penalties"); Tr. at 4785 (Juror No. 246 responding, "I think I can" to defense counsel's questioning as to whether he was "able to vote for any one of the three penalties"); Tr. at 6016 (Juror No. 391 testifying that he could "give fair, meaningful consideration to all three of those

6

potential penalties if called upon"); Tr. at 6092 (Juror No. 398 declaring that she "would [not] automatically impose or disregard" "any one of those potential penalties"). To accept Isom's claim that the trial court erred in denying his for-cause challenges to these jurors on the basis the jurors refused to consider the potential penalty options would preclude the trial court from making a credibility determination as to whether the juror is sincere in "stat[ing] on oath that the juror feels able, notwithstanding the juror's opinion, to render an impartial verdict upon the law and evidence." I.C. § 35-37-1-5(b)(2). This is precisely what our statute proscribes and what the trial court did here. See Id. We repeat for emphasis, "a constitutionally impartial juror is one who is able and willing to lay aside his or her prior knowledge and opinions, follow the law as instructed by the trial judge, and render a verdict based solely on the evidence presented in court." Whiting, 969 N.E.2d at 28 (citing Irvin, 366 U.S. at 722-23). We find no error here.

## C. Failure to understand legal concepts applicable to the case

Isom's remaining challenges for cause involved the following prospective jurors: Juror No. 44, contending the juror failed to understand the defendant's presumption of innocence; Juror No. 57, asserting the juror did not believe that the defendant had the right to remain silent; and Juror No. 398, positing that the juror had predetermined that the defendant was guilty and that the burden lied with the defense to prove his innocence. See Tr. at 2356, 2369-71, 2387-90, (Juror No. 44); Tr. at 2028-29 (Juror No. 57); Tr. at 6101-03, 6112-17 (Juror No. 398).

As with Isom's other challenges for cause, the trial court—along with counsel for the State and the defense—engaged in an extensive colloquy with each prospective juror. And although the record reflects an *initial* lack of understanding of the requisite legal standards governing the presumption of innocence and a defendant's right to remain silent, without more, this is simply insufficient to hold that the jurors should have been dismissed for cause. Particularly where, as here, the trial court explained each legal principle that Isom now complains of and in each instance the prospective juror acknowledged that he/she understood and would be able to apply that standard to the evidence as presented at trial. Tr. at 2028, 2029 (explaining to Juror No. 57 that "Defendant never has to speak on his own behalf and he is presumed innocent throughout the entire trial" to which she declared, "if Mr. Isom does not testify, [she would not] somehow hold it against him"); Tr. at 2356 (Juror No. 44 responding,

7

"[y]es," to the trial court's question, "are you able to presume that he is innocent, ma'am?"); Tr. at 6102 (Juror No. 398 testifying that "if the State or the Prosecutor failed to provide [her] with enough evidence to convince [her] beyond a reasonable doubt" that Isom had committed the charged crimes she would vote "not guilty"). Again Isom's argument to the contrary amounts to a request that we reject the trial court's credibility determination which, again, we decline to do. See I.C. § 35-37-1-5; Oswalt, 19 N.E.3d at 245. There was no error here.

## II.  Motions for Mistrial

Whether to grant or deny a motion for a mistrial lies within the sound discretion of the trial court. Treadway v. State, 924 N.E.2d 621, 628 (Ind. 2010). We afford great deference to the trial court's decision and review the decision solely for abuse of that discretion. Id. Isom claims such abuse for two motions, which the trial court denied.

### A.  *Testimony of Eddie Green*

For his first challenge to the denial of his motion for mistrial, these are the facts. During its case-in-chief, the State presented Eddie Green, a man who lived in the apartment beneath that of the Isom family. Green was at home at the time of the shootings and called 911 reporting gunfire. During his direct examination, Green testified that he heard a girl say, "daddy," and that he heard Isom's "daughter talking" inside the apartment just before the shooting began. Tr. at 7577, 7578. The trial court sustained defense counsel's hearsay objection to this testimony and struck the references to "daddy" at counsel's request. The trial court gave the following admonishment: "All right. Ladies and gentlemen, any comment about the words, 'that was the daughter' or 'the daughter', are ordered stricken from the record and you are to disregard that." Tr. at 7583. Isom then moved for a mistrial, which the trial court denied. Later during trial Isom submitted a curative instruction which the trial court read to the jury. The instruction provided: "Any testimony from any witness which has been struck by the Court is not evidence and . . . you may not consider it for any purpose in this case." Tr. at 7602-03, 7607. Ultimately Green was allowed to testify that he heard a "soft, calm" "female voice" and then heard "gunshots." Tr. at 7609. Isom now claims error in the denial of his motion for mistrial.

8

"[A] mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." Mickens v. State, 742 N.E.2d 927, 929 (Ind. 2001). Here Isom does not explain why the trial court's admonishments—one of which was given at Isom's request—were not sufficient. Indeed he acknowledges "[a] properly submitted admonition to the jury is presumed to cure any error in admission of the evidence," Br. of Appellant at 27 (citation omitted), but nonetheless argues that the admonishment in this case "would not cause the jury to disregard Green's testimony" as instructed. Id. We reject Isom's argument. "On appeal, we must presume that the jury obeyed the court's instructions in reaching its verdict." Tyson v. State, 386 N.E.2d 1185, 1192 (Ind. 1979). As we have noted a "clear instruction, together with strong presumptions that juries follow courts' instructions and that an admonition cures any error, severely undercuts the defendant's position." Lucio v. State, 907 N.E.2d 1008, 1010-11 (Ind. 2009) (rejecting defense argument of trial court error in denying motion for mistrial where trial court admonished the jury to disregard witness's improper statement). The same is true here. We are not persuaded the trial court abused its discretion in denying Isom's motion for mistrial.

### B. Testimony of Officer Thomas Pawlak

For Isom's second motion for mistrial the facts are as follows. Thomas Pawlak was one of the police officers dispatched to the scene that evening. After he arrived and exited his vehicle he heard multiple gunshots but was unable to identify the precise location from where the shots were coming. At about the same time, a car pulled up and two unidentified black males got out of the vehicle and ran to the middle of the street in front of the apartment building. "They were waving their hands, jumping up and down, yelling and screaming towards the building." Tr. at 8084. Officer Pawlak heard the men shouting, "Kevin, what are you doing? Stop this sh**." Tr. at 8085. When attempts to order the men to get out of the street failed, Officer Pawlak pulled the men aside to safety behind a parked car at which point he inquired who was doing the shooting. The men stated that the shooter was their cousin, Kevin Isom, and he was inside the apartment with his wife and two children. Two other officers—Sargent Mark Davis and Officer Peter Baum—who had been dispatched to the scene joined Officer Pawlak behind the parked car. Shortly thereafter the two unidentified black males left the scene, purportedly to retrieve Isom's mother who lived a short distance away. Officer Baum attempted to follow

them, which prompted another round of gunfire, forcing him to seek cover behind another parked car. Officer Pawlak and Sargent Davis also remained trapped. The officers remained there for approximately 3 hours until the SWAT team arrived to provide assistance. The two men never returned to the scene, none of the officers obtained their names, and neither of the men appeared at trial. Instead, their statements were recounted through the testimony of Officer Pawlak. Isom objected on grounds of hearsay and a violation of his right of confrontation. The trial court overruled the objection. As to Isom's hearsay objection, the trial court cited exceptions under Evidence Rule 803(1) (present sense impression) and Rule 803(2) (excited utterance).[4] With respect to Isom's right of confrontation claim, the court concluded that under the circumstances there was no such right. Isom moved for a mistrial, which the court denied.

As a preliminary matter, the State contends that Isom has waived this issue for review. The State argues that because Isom failed to request an admonishment regarding Officer Pawlak's testimony, the issue has been waived.

When faced with a circumstance that a defendant believes might warrant a mistrial, generally the correct procedure is to request an admonishment. Etienne v. State, 716 N.E.2d 457, 461 (Ind. 1999). If counsel is unsatisfied with the admonishment or it is obvious that the admonishment will not be sufficient to cure the error, then counsel may move for mistrial. Id. A "failure to request an admonishment *or* move for a mistrial results in waiver of the issue." Id. (emphasis added). First, it is not apparent what admonishment Isom might have requested. After extended argument outside the presence of the jury, the trial court overruled Isom's objection to Officer Pawlak's testimony. See Tr. at 8016-83. Essentially no admonishment

_____

[4] At the time of trial, Indiana Evidence Rule 803 provided in relevant part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness.
>
> (1) Present Sense Impression. A statement describing or explaining a material event, condition or transaction, made while the declarant was perceiving the event, condition or transaction, or immediately thereafter.
>
> (2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

could cure the error about which Isom complained. See Holsinger v. State, 750 N.E.2d 354, 366 (Ind. 2001) (Dickson, J., concurring in part and dissenting in part) ("When an admonishment would be futile, the failure to request one does not preclude appellate review of a denial of an otherwise timely motion for mistrial."). In any event waiver occurs where there was neither a request for admonishment *nor* a motion for mistrial. Because Isom sought a mistrial, appellate review of his claim has not been waived. We thus proceed to the merits.

A trial court has broad discretion in ruling on the admissibility of evidence and we will disturb the court's rulings only where the petitioner has shown an abuse of that discretion. Turner v. State, 953 N.E.2d 1039, 1045 (Ind. 2011) (quotation omitted). "But where, as here, a constitutional violation is alleged, the proper standard of appellate review is de novo." Speers v. State, 999 N.E.2d 850, 852 (Ind. 2013), cert. denied 134 S.Ct. 2299 (2014).

Isom does not challenge the trial court's ruling with respect to his hearsay objection. Rather, Isom contends the trial court violated his federal constitutional right of confrontation. The Confrontation Clause of the Sixth Amendment to the United States Constitution, which is made applicable to the States by the Fourteenth Amendment, provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The United States Supreme Court has determined that a statement violates the Confrontation Clause if, among other things, it is "testimonial" in nature. Crawford v. Washington, 541 U.S. 36, 68-69 (2004). To determine whether a statement is testimonial, we must decide whether it has "a primary purpose of creating an out-of-court substitute for trial testimony." Michigan v. Bryant, 562 U.S. 344, ___, 131 S.Ct. 1143, 1155 (2011). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Davis v. Washington, 547 U.S. 813, 822 (2006). Conversely, a declarant's statements "are testimonial when the circumstances objectively indicate that *there is no such ongoing emergency*, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id. (emphasis added) (footnote omitted).

11

In order to determine whether a statement is testimonial versus nontestimonial, we must consider: (1) whether the declarant is describing present or past events; (2) whether there is an ongoing emergency at the time that the statements are made; (3) whether the nature of the questions asked and the responses given were made in an effort to resolve a present emergency; and (4) the degree of formality during the course of the police questioning. Id. at 827. Simply put, statements generally elicited from individuals seeking help during an ongoing emergency are not classified as testimonial. See Id. at 828.

Isom's claim requires us to consider two separate statements made to the police. The first is "Kevin, what are you doing? Stop this sh**." Tr. at 8085. This statement was made almost immediately after the two unidentified men arrived and not made in response to any police questioning. Indeed, it was blurted out by two men who appeared in the middle of the street while someone was firing a weapon pinning down police officers, and their comments were directed towards the individual they believed to be shooting inside the apartment building rather than in response to police questioning. Officer Pawlak simply happened to be within earshot when the statement was made because he too was on the scene at the time the crisis was ongoing. As the trial court explained: "The words are an effort by the concerned parties to stop the event which is still in progress, not an interrogation by the police." Tr. at 8072. Consequently, the trial court concluded that this statement was not testimonial and thus did not implicate the Confrontation Clause. We agree and discern no error on this point.

The second statement about which Officer Pawlak was allowed to testify was offered in response to the officer's question, "who's shooting," to which the men responded, "their cousin Kevin Isom." Tr. at 8166. Because this statement was apparently "made in the course of police interrogation" at the scene of the crime, the question to be resolved is whether the "circumstances objectively indicat[e] that the primary purpose of the interrogation [wa]s to enable police assistance to meet an ongoing emergency." Davis, 547 U.S. at 822.

According to Isom, "[t]he testimony that Kevin was doing the shooting was elicited in violation of the appellant's confrontation rights because he was not allowed to cross examine the declarant and it was extremely prejudicial to his defense." Br. of Appellant at 29. As best we

12

can discern Isom seems to contend that because the information that Officer Pawlak received from the declarants identified a particular individual as the shooter, it "was not elicited to help with the ongoing emergency but was elicited by the police in their investigative role." Id. at 28. We cannot agree.

When Officer Pawlak arrived at the scene he was greeted with the sound of gunfire and soon thereafter forced to run for cover. Before the police were able to identify the source of gunfire, two men arrived and began shouting towards the apartment from where the shots originated. After Officer Pawlak secured the men behind a vehicle—sheltered from the gunfire's range—he began to inquire what the men knew of the shooting. At this time, he was informed that they believed the defendant to be the shooter and that he resided in the apartment with his wife and two children. This information was regarding "events as they were actually happening," and was necessary to aid the officers who were "facing an ongoing emergency." Davis, 547 U.S. at 827 (emphasis omitted). Because the shooting was ongoing at the time the information was sought, it was certainly "necessary to be able to resolve the present emergency" rather than simply investigating past events. Id. (emphasis omitted). "Officers called to investigate [ongoing] disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty., 542 U.S. 177, 186 (2004). Based on the facts presented here, we conclude the declarants' identification of Isom as the shooter was a nontestimonial statement and the trial court did not violate Isom's constitutional rights by allowing it at trial. See Davis, 547 U.S. at 828 (concluding that declarant's identification of the defendant to an emergency response agent during her 911 call was not testimonial and thus admissible at trial because "the circumstances of [the victim's] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency"); but see 547 U.S. at 832 (concluding that declarant's identification in Hammon v. Indiana of the defendant as her abuser after the alleged attack occurred was testimonial because the declarant's "statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation").

13

## III.    Jury Instructions

"The purpose of a jury instruction 'is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict.'" Dill v. State, 741 N.E.2d 1230, 1232 (Ind. 2001) (quoting Chandler v. State, 581 N.E.2d 1233, 1236 (Ind. 1991)). We review a trial court's instructions to the jury for an abuse of discretion. Treadway, 924 N.E.2d at 636. An abuse of discretion arises when the instruction is erroneous and the instructions taken as a whole misstate the law or otherwise mislead the jury. Mayes v. State, 744 N.E.2d 390, 394 (Ind. 2001). "When evaluating the jury instructions on appeal this Court looks to whether the tendered instructions correctly state the law, whether there is evidence in the record to support giving the instruction, and whether the substance of the proffered instruction is covered by other instructions." Treadway, 924 N.E.2d at 636.

### A.  *Voluntary manslaughter*

Isom makes two claims concerning jury instructions. He first contends the trial court was wrong in failing to give his tendered instruction on voluntary manslaughter. The essential facts are these. During a jury-instruction conference before final summation in the guilt phase of trial Isom tendered an instruction on voluntary manslaughter as a lesser included offense of the murder charges. Isom contended that a knife discovered at the crime scene supported an instruction for voluntary manslaughter. According to Isom the presence of the knife "could certainly lead the jury to infer that in fact there was an argument. That there was, in fact, sudden heat . . . ." Tr. at 13082. Isom insisted "the knife could lead the jury to infer . . . there was an argument. That there was anger, there was rage, there was resentment, there was jealousy, that there was terror and that as a result of an excited mind, the perpetrator of the crime did what he did." Tr. at 13085. The trial court denied the motion explaining in part:

> [T]here is no evidence in the record that there was an argument that preceded any actions. And therefore, this Court concludes that there is no serious evidentiary dispute that exists as to the evidence on sudden heat. There is no appreciable evidence of sudden heat that justifies an instruction on Voluntary Manslaughter.

Tr. at 13091. Following the State's closing argument, Isom again moved the trial court for an instruction on voluntary manslaughter declaring:

> [I]n the closing argument by the State, they talk about anger. They talk about rage . . . . You add that to the knife situation . . . the State is making its conclusion of anger and rage. And that in the defense's point of view, again establishes sudden heat, which would be a lesser included of murder in this case.

Tr. at 13155-56. The trial court again denied the motion. Isom claims error.

A trial court must engage in a three-step analysis when determining whether to instruct a jury on a lesser included offense of the crime charged. Wright v. State, 658 N.E.2d 563, 566-67 (Ind. 1995). First, the trial court must consider whether the alleged lesser included offense is an inherently included offense to the principal charge. Id. If it is not, then the trial court must decide whether the alleged lesser included offense is a factually included offense to the principal charge. Id. at 567. Finally, if the alleged lesser included offense is either an inherently or factually included offense to the principal charge, then the trial court must determine if there is a serious evidentiary dispute regarding the element that distinguishes the lesser offense from the principal charge. Id. If such a dispute is present and a jury could conclude that the lesser offense was committed but not the principal charge, then it is reversible error for the trial court to refuse to give the jury instructions on the lesser included offense. Id.

Our jurisprudence teaches that voluntary manslaughter is an inherently lesser included offense of murder. See Watts v. State, 885 N.E.2d 1228, 1232 (Ind. 2008). This is not a typical example of a lesser included offense in that what distinguishes voluntary manslaughter from murder is the existence of sudden heat, which is not an element of murder, but rather "a mitigating factor in conduct that would otherwise be murder." Wilson v. State, 697 N.E.2d 466, 474 (Ind. 1998) (quoting Estes v. State, 451 N.E.2d 313, 314 (Ind. 1983)). "Sudden heat occurs when a defendant is provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection." Conner v. State, 829 N.E.2d 21, 24 (Ind. 2005). Thus, an instruction on voluntary manslaughter as a lesser included offense to a murder charge is

15

warranted only if the evidence reflects a serious evidentiary dispute regarding the presence of sudden heat. Watts, 885 N.E.2d at 1232.

Isom contends "the testimony of the witnesses showed that Isom's anger continued as he was shooting recklessly" such that the evidence of his "anger and rage about the end of his marriage" as introduced by the State is sufficient to establish a serious evidentiary dispute. Br. of Appellant at 40, 39. We make the following observations. First, it is true that one of the State's proffered motives for the killings was that "Isom was angry about the marriage falling apart." Id. at 40; see also Tr. at 13140 (arguing to the jury during closing remarks: "It was the wedding anniversary in which there wasn't much to celebrate. Kevin recently unemployed. And Cassandra days before mentioned she may be leaving him."). But "[a]nger standing alone is not sufficient to support an instruction on sudden heat." Wilson, 697 N.E.2d at 474. Further "[a]n otherwise normally stressful encounter does not suddenly inflame sudden heat, mitigating murder, simply because a person suffers from a [particular state of mind] which gives him a 'hair trigger.'" Id. (rejecting defendant's claim that post-traumatic stress disorder triggered flashbacks in stressful situations—such as seeing his wife with her boyfriend—and was sufficient to give rise to the presence of sudden heat because "the record indicate[d] he was *angry* about the relationship his wife was having." (emphasis added)).

Second, to the extent Isom contends that Cassandra must have said something to provoke his rage, we note there is simply nothing in the record about a conversation between the two in the moments before Cassandra and the children were shot. And we reject as pure speculation Isom's contention that "[w]hatever was said may have triggered the rage which erupted from Isom, the very rage that the State described to the jury in its closing." Br. of Appellant at 40 n.15.[5] Third, and importantly, even assuming Cassandra or the children said something to Isom that may have been provocative, "[w]ords alone are not sufficient provocation to reduce murder to manslaughter." Perigo v. State, 541 N.E.2d 936, 939 (Ind. 1989).

---

[5] We note that in his statement to police, which was introduced into evidence over Isom's objection (and for which no claim of error has been raised on appeal), Isom answered, "No," to the question, "Was there an argument or fight before the [sic] this incident occurred." Tr. at 12620. He also answered, "No," to the question, "Did your wife or kids make any threats against you yesterday." Tr. at 12621.

16

In this case there was no evidentiary dispute—and certainly not a serious one—regarding sudden heat, the mitigating circumstance that distinguishes voluntary manslaughter from murder. As such the trial court did not abuse its discretion in declining to give a voluntary manslaughter instruction to the jury.

**B.  *Weighing of aggravating and mitigating factors***

Isom next contends the trial court improperly instructed the jury during the penalty phase of the proceedings.  According to Isom the trial court erred in reading to the jury Instruction No. 8 because it did not instruct the jury that it must find that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt in order to recommend a sentence of death.  Essentially, this argument amounts to a claim that the trial court's instruction was not a correct statement of the law.  Instruction No. 8 reads as follows:

> You may recommend the sentence of death or life imprisonment without parole only if you unanimously find:
>
> 1.  That the State of Indiana has proven beyond a reasonable doubt that the charged aggravating circumstance exists as to each count in Counts VIII, IX and X
>
> And
>
> 2.  That any mitigating circumstance or circumstances that exist *are outweighed by the charged and proven aggravating circumstance.*

App. at 849 (emphasis added).

During the instruction conference preceding the penalty phase of trial, defense counsel objected to the emphasized portion of this tendered instruction.  Isom claims that this instruction is not a correct statement of the law because the latter sentence should read, "[t]he aggravating circumstance must outweigh the mitigating circumstance or circumstances *beyond a reasonable doubt.*"  Br. of Appellant at 19 (emphasis added) (footnote omitted) (alteration in original).

17

We recently addressed this same argument in <u>Inman v. State</u>, 4 N.E.3d 190 (Ind. 2014). In that case, Inman argued that Indiana Code section 35-50-2-9(l),[6] also the governing statute here, was unconstitutional because it does not require the weighing of aggravating and mitigating circumstances be determined beyond a reasonable doubt. We were not persuaded by this argument and affirmed the defendant's conviction and life without parole sentence. In so doing, we rejected his challenge to our decision in <u>Ritchie v. State</u> where a majority of this Court concluded "the Indiana Death Penalty Statute does not violate the Sixth Amendment as interpreted by <u>Apprendi</u>[7] and <u>Ring</u>[8] [because] [o]nce a statutory aggravator is found by a jury beyond a reasonable doubt, the Sixth Amendment as interpreted in <u>Ring</u> and <u>Apprendi</u> is satisfied." 809 N.E.2d 258, 268 (Ind. 2004). Our conclusion in <u>Inman</u> is controlling here. As we explained in that case: "Because we concluded in <u>Ritchie</u> that neither federal constitutional doctrine under <u>Apprendi</u> and <u>Ring</u> nor Indiana state jurisprudence leads to the requirement that weighing be done under a reasonable doubt standard, the trial court was not required to [instruct the jury to] weigh the aggravating circumstances and mitigating circumstances beyond a reasonable doubt." <u>Inman</u>, 4 N.E.3d at 196 (internal quotation omitted). We laid whatever

---

[6] The statute provides:

> (l) Before a sentence may be imposed under this section, the jury, in a proceeding under subsection (e), or the court, in a proceeding under subsection (g), must find that:
>
> > (1) the state has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances listed in subsection (b) exists; and
> >
> > (2) any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

I.C. § 35-50-2-9(l).

[7] <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000) (holding: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

[8] <u>Ring v. Arizona</u>, 536 U.S. 584, 609 (2002) (holding that the Sixth Amendment right to a jury trial precludes "a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty" where the "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense'" (internal citation omitted) (quoting <u>Apprendi</u>, 530 U.S. at 494 n.19)).

uncertainty there may have been regarding this issue to rest in <u>Inman</u> and we decline to revisit the issue here.[9]

## IV.    Juror's Question

Isom next challenges the trial court's refusal to allow a witness to answer a juror's question during the penalty phase of trial.  This claim is based on the following facts.  In his case-in-chief Isom called as witnesses two of his cousins, one of whom testified that she had spoken to Cassandra's parents who "told [her] that they forgive.  They forgive him."  Tr. at 13442.  The other testified that Cassandra's parents "don't want the death penalty."  Tr. at 13533.  In rebuttal the State called as witnesses Cassandra's father and sister.  Both denied having any conversations with the family about their forgiveness or the State's request for the death penalty.  Before Cassandra's sister was excused, the trial court invited questions from the jury.  One juror inquired, "does the family forgive Kevin?"  Tr. at 13828.  The trial court did not permit the witness to answer the question.  Isom claims reversible error.

"This Court has previously held that it is proper to permit jurors to propound questions during the progress of a trial, subject to proper regulation by the trial court."  <u>Tyson v. State</u>, 386 N.E.2d 1185, 1192 (1979) (citing <u>Carter v. State</u>, 234 N.E.2d 650, 652 (Ind. 1968)).  Isom argues, "[f]orgiveness is potentially a significant piece of evidence that should have been considered by the jury before it made its recommendation to the court."  Br. of Appellant at 60-61.  Thus, according to Isom, the failure to permit the witness to answer the juror's question as to whether "the family forgive[s] Kevin" impinged upon his right to present mitigation evidence and was thus improper.

Indiana Code section 35-50-2-9(c) sets forth a number of mitigating circumstances that the jury (or the judge in the case of a bench trial) may consider when determining whether a

---

[9] In <u>Ritchie</u> the author of this opinion dissented in part believing the plain language of the statute makes death eligibility contingent upon certain findings that must be weighed by the jury on proof beyond a reasonable doubt. But the author acknowledges <u>Ritchie</u> as *stare decisis* on this issue.

sentence of death should be imposed.[10]  There is a statutory "catch-all" mitigator—"[a]ny other circumstances appropriate for consideration."  I.C. § 35-50-2-9(c)(8).  We have observed:

> [T]he Legislature's choice to allow death penalty defendants to present every conceivable mitigator is in compliance with Lockett v. Ohio, 438 U.S. 586 [(1978)], which requires that "the sentencer . . . not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

Minnick v. State, 698 N.E.2d 745, 761 (Ind. 1998) (omission in original) (quoting Lockett, 438 U.S. at 604 (emphasis omitted) (footnote omitted)).  It is this proposition upon which Isom relies in contending the trial court committed reversible error in not allowing the witness to answer the juror's question.

It is true that expressions of forgiveness by a victim of a crime may be considered a mitigating circumstance.  See e.g. Deane v. State, 759 N.E.2d 201, 204 (Ind. 2001) (involving a defendant convicted of murder and attempted murder in the shooting death of his brother and the serious wounding of his mother.  Surviving mother expressed forgiveness and sought leniency.

---

[10] The statute provides:

> The mitigating circumstances that may be considered under this section are as follows:
>
> (1)  The defendant has no significant history of prior criminal conduct.
> (2)  The defendant was under the influence of extreme mental or emotional disturbance when the murder was committed.
> (3)  The victim was a participant in or consented to the defendant's conduct.
> (4)  The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor.
> (5)  The defendant acted under the substantial domination of another person.
> (6)  The defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.
> (7)  The defendant was less than eighteen (18) years of age at the time the murder was committed.
> (8)  Any other circumstances appropriate for consideration.

I.C. § 35-50-2-9(c).

The trial court considered as mitigating factors the hardship on the defendant's son, and the mother's "expression of forgiveness and request for leniency."); Rowe v. State, 539 N.E.2d 474, 478 (Ind. 1989) (involving a defendant convicted of murder and two counts of attempted murder in the shooting death of his mother and the wounding of his father and sister. The surviving father and sister expressed forgiveness recommending the defendant receive drug rehabilitation rather than prison. On appeal, rejecting defendant's Appellate Rule 7(B) challenge to his 100-year sentence we declared "the trial court was well within its discretion in finding the aggravating factors to outweigh the mitigating factors of appellant's age and his family's forgiveness."). However, unlike in Deane and Rowe, here there were no surviving victims to express forgiveness. To be sure family members as well as close friends and perhaps even the community at large may be considered "victims" of these horrendous crimes in a general sense. But for purposes of mitigation evidence the issue is whether Cassandra, Ci'Andria, or Michael forgave Isom for his crimes. This is unknowable. In short Isom does not explain how the *family's* forgiveness is a mitigating factor. That is to say, he does not explain how or why the family's thoughts on the killings have a bearing on Isom's character or any circumstances of the offenses. See Minnick, 698 N.E.2d at 761. The trial court committed no error in disallowing the witness' testimony.[11]

### V.      Allegations of Prosecutorial Misconduct

During the penalty phase of trial the deputy prosecutor made several comments that Isom contends amount to prosecutorial misconduct because, according to Isom, they focused not on the charged aggravator and how that aggravator outweighed any mitigating factors, but rather "direct[ed] the jury to focus on the horrible nature of the killings and on Kevin Isom's failure as a provider, protector and as [a] man who could not even hold onto a job." Br. of Appellant at 63.

---

[11] Even assuming for the sake of argument that the family's forgiveness qualifies as a mitigating factor Isom's argument still fails. His implicit presumption is that the family did in fact forgive him and thus an affirmative answer to the question was forthcoming. But this is pure speculation. Further, it ignores events occurring only moments before. The witness—Cassandra's sister—had just testified in rebuttal and denied having any conversation with the family about forgiveness. Isom does not explain why he believes her answer to the juror's question would have reflected a different reality.

Before addressing the merits of this contention, we pause to observe that Isom did not object at trial to the purported misconduct. A party's failure to present a timely objection to the alleged misconduct at trial results in waiver of appellate review. Stevens v. State, 691 N.E.2d 412, 420 (Ind. 1997). If a defendant properly raises and preserves the issue of prosecutorial misconduct, then the reviewing court determines: "(1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected." Baer v. State, 866 N.E.2d 752, 756 (Ind. 2007) (quoting Cooper v. State, 854 N.E.2d 831, 835 (Ind. 2006)).

"Where a claim of prosecutorial misconduct has not been properly preserved, our standard for review is different from that of a properly preserved claim. More specifically, the defendant must establish not only the grounds for the misconduct but also the additional grounds for fundamental error." Cooper, 854 N.E.2d at 835. "The 'fundamental error' exception is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." Halliburton v. State, 1 N.E.3d 670, 678 (Ind. 2013) (alteration omitted) (quoting Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006)). "The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process." Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010) (internal quotations omitted).

With the foregoing standard in mind we now address the merits of Isom's claim. Under the death penalty statute, following the completion of the guilt-determination phase of the trial and the rendering of the jury's verdict, the trial court reconvenes the jury for the penalty phase. I.C. § 35-50-2-9(d); Brown v. State, 783 N.E.2d 1121, 1127 (Ind. 2003). "The jury may recommend . . . the death penalty" only if it finds: "(1) the state has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances listed in subsection (b) exists; and (2) any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." I.C. §§ 35-50-2-9(e), (l).

As noted earlier in this opinion, the State sought the death penalty based on the (b)(8) aggravator—that Isom committed multiple murders. Proceeding to the penalty phase of trial the State moved to "incorporate, by reference, all parts, components of the guilt phase, specifically but not limited to the verdicts returned on Counts I, II, III, IV, V and VI." Tr. at 13297. The trial court granted the motion declaring: "Ladies and gentlemen, you may properly consider all of the evidence that has been submitted in this case so far." Id. After then introducing into evidence the certified death certificates of Cassandra, Michael, and Ci'Andria, the State rested.

The defense presented its case over the next two days calling eighteen witnesses that included four psychologists, a special education elementary school teacher who taught school in the neighborhood where Isom lived as a child, two Lake County correctional officers, Isom's mother, and several of Isom's other relatives. In summary their collective testimony established the following. Isom, who was forty-one years of age at the time of the killings, was an only child with an absent father. He and his mother moved frequently. During high school, he and his mother lived in a housing project in Chicago where gangs controlled the turf. Isom was assaulted at least once and began to withdraw into himself and disassociate from everyone except his family, but he nonetheless graduated from high school. He has a degenerative back disorder that constantly plagued him and prevented him from entering military service. Essentially he was a loner who eventually got a job as a security guard, but he had lost that job just a few months before the killings and had started drinking. He felt pressured because his wife was the sole support of the family and wanted him to get another job. She told him she was going to divorce him. Isom served nearly six years in the Lake County jail awaiting trial without any disciplinary incidents. Isom suffered extreme emotional distress that set him off that night and explained why he experienced dissociative amnesia after the killings. See Tr. at 13300-728. The defense then rested.

The State then proceeded with the opening phase of its closing remarks. Following are the remarks that Isom contends represent prosecutorial misconduct:

> [T]he State of Indiana endorses the penalty of death in this case. . .
> . It's the appropriate penalty when you look at aggravating
> circumstance in this case. The aggravation relative to the multiple

23

killing circumstance. That, in fact, three individuals were murdered by Mr. Isom. Those individuals were a mother, and her two children. That, in fact, those three individuals are family. Multiple killing dictates, tells us Mr. Isom eliminated a family from this earth.

That mother had two children, a 16-year-old son and a 13-year-old daughter. Neither provided, allowed the opportunity to grow and develop into adults. Their lives were terminated on August 6, 2007.

In regard to the aggravation in terms of the facts and circumstances, you will recall from the evidence brought forward Cassandra received that devastating shotgun blast that was put to her head as she was on the floor and evacuated her brain from her skull. That followed, were involved additionally, five entrance wounds from a small firearm, from the handguns, where the wounds were inflicted additionally to her chest, her abdomen, and her back.

Michael Moore also having received the shotgun blast, two additional handgun wounds to the back and flank area along with grace [sic] wounds to his arms.

And finally 13-year-old Ci'Andria. Ci'Andria's reward for being home that afternoon, that early evening was that she was shot with a 12-gauge pump action pistol grip Mossberg shotgun. That she received eight separate unrelated entry wounds from the handgun. One of those wounds to her head. Additional to her arms and her back.

. . . [T]he State has proven to you the aggravating circumstance in this case. . . . And . . . the appropriate penalty upon concluding your thoughts, your balancing is that a sentence of death deserves to be returned.

Tr. at 13835-37. By these remarks, according to Isom, "[t]he deputy prosecutor then amped up the aggravating factor from simply proving multiple murders to include the nature and circumstance of the crime." Br. of Appellant at 63.

"[T]he circumstances of a crime often provide 'an appropriate context for consideration of the alleged aggravating and mitigating circumstances.'" Corcoran v. State, 739 N.E.2d 649, 657 (Ind. 2000) (quoting Prowell v. State, 687 N.E.2d 563, 567 (Ind. 1997)). Here, the defense

24

team had just concluded two days of trial presenting testimony exploring, among other things, Isom's troubled childhood and stress-filled adult life. The State merely highlighted, albeit in graphic and dramatic fashion, the circumstances surrounding its multiple murder aggravator, and by implication why the strength of this aggravator outweighed any of the defense team's proposed mitigating factors. In essence the deputy prosecutor recounted the evidence introduced during the guilt phase of trial, arguing that the State proved beyond a reasonable doubt that Isom intentionally killed three people—an aggravating circumstance. We discern no misconduct with these remarks.

During his closing remarks defense counsel talked about Isom's troubled childhood and growing up in a neighborhood that one of the defense witnesses characterized as a "war zone." Tr. at 13842. Counsel specifically focused on Isom's "extreme emotional disturbance" that triggered the events of August 6, 2007. Tr. at 13850. Counsel continued: "We are all talking about anger, we are all talking about leaving marriage, losing a job. Those are all, to someone of Kevin's makeup, is devastating. This is the man that locked himself in a room over the death of a family member." Tr. at 13851. Counsel implored the jury: "I am asking you on behalf of Kevin to sentence him to a term of years." Tr. at 13853-54.

Among other things, during the rebuttal phase of its closing remarks, the State appeared to encourage the jury to consider Isom's character in reaching its decision:

> [T]he State proposes to you that, in fact, those acts of murder, of killing, of slaughtering his family were the a [sic] culmination of Kevin Isom slowly and consciously and deliberating making those decisions. . . .
>
> And those facts demand death.
>
> Because ultimately, ladies and gentlemen, *Kevin Isom failed Cassandra as a wife* [sic] *and as a life partner. He failed the children as a father. He failed himself as a man. He failed his mother as a son. And he failed the community as a productive and constructive member of that community.*

> And for what he did, under the constrain[t]s that you're given of balancing aggravating and mitigating facts, ladies and gentlemen, death is appropriate.

Tr. at 13862-63 (emphasis added). As we have repeatedly held "when the death sentence is sought, courts must . . . limit the aggravating circumstances eligible for consideration to those specified in the death penalty statute." Cooper, 854 N.E.2d at 840 (quoting Pope v. State, 737 N.E.2d 374, 383 (Ind. 2000) (quoting Bivins v. State, 642 N.E.2d 928, 955 (Ind. 1994))); Corcoran, 739 N.E.2d at 655. Here, in essence, the State invited the jury to recommend the death sentence, because "Kevin Isom failed Cassandra . . . as a life partner. He failed the children as a father. He failed himself as a man. He failed his mother as a son. And he failed the community as a productive and constructive member of that community." Tr. at 13863.

Regarding these comments we make the following observations. First, Isom's character has no place in the penalty phase of the proceedings. "None of the statutory factors include the character of the defendant." Castillo v. State, 974 N.E.2d 458, 469 (Ind. 2012) (citing I.C. § 35-50-2-3(b)). Second, the defendant's relationships with the victims have no bearing on establishing the alleged aggravator of multiple killings, nor do they rebut the proffered mitigators by the defense, nor explain why the sole aggravator outweighs the dozens of mitigating circumstances. While perhaps relevant in determining his commission of the charged crimes during the guilt phase, such an invitation to consider any facts of the case other than the proscribed statutory aggravators—even in part—during the penalty phase where the State seeks death is inappropriate. See Cooper, 854 N.E.2d at 839, 840-41 (finding prosecutorial misconduct during the penalty phase where "the State encouraged the jury on several occasions to consider Cooper's character in reaching its decision").

It is misconduct for a prosecutor to request a jury to return a death penalty for anything other than that the mitigating factors are outweighed by the aggravating factor or factors. Id. at 841. In this case the State stepped over the line. However, we emphasize that Isom did not object at trial to the State's remarks. So the question now before us is whether the remarks were so prejudicial to Isom's right of fundamental due process as to make a fair trial impossible. That is, was the resulting harm or potential for harm substantial? Halliburton, 1 N.E.3d at 678. We

think not. These remarks were relatively isolated and came near the end of a fairly lengthy summation. The jury had listened to several weeks of testimony, including two days of testimony and evidence in mitigation. We are of the opinion that any harm done by the prosecutor's remark was *de minimus* and not substantial. Thus, the error did not result in denying Isom fundamental due process thereby making a fair trial impossible.

## VI.    Appropriateness of Death Sentence

Isom seeks our review of his death sentence for appropriateness. The Indiana Legislature has determined that in capital jury trials, the question of whether to sentence a defendant to the death penalty is determined by the jury, after which the trial court "shall sentence the defendant accordingly." I.C. § 35-50-2-9(e). And here, correctly following the statutory mandate, the trial court sentenced Isom to death. Thus "[t]he factual predicates of a sentence—the eligibility for death or life without parole—are reserved to the jury by the Sixth Amendment" as well as by statute. Pruitt v. State, 834 N.E.2d 90, 121 (Ind. 2005) (citing Ring, 536 U.S. at 589). But death sentences are subject to our "automatic review" under Indiana Code section 35-50-2-9(j) and importantly, Article 7, Section 4 of the Indiana Constitution grants this Court, in all criminal appeals, the authority "to review and revise the sentence imposed." Ind. Const. art. 7, § 4. "We have implemented this discretionary authority in all criminal cases through our adoption of Indiana Appellate Rule 7[(B)]." Baer, 866 N.E.2d at 764. The Rule provides: "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. App. R. 7(B). Accordingly, the appropriateness of a death sentence, unlike the eligibility for a death sentence, is a matter left to the discretion of this Court. See Pruitt, 834 N.E.2d at 121-22. Nonetheless, a defendant must persuade the court "that his or her sentence has met this inappropriateness standard of review." Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

In considering the nature of the offense, a term of years is the starting point the legislature selected as appropriate for the crime of murder. See I.C. § 35-50-2-3. However, alternative penalties of life without parole or death are available upon proof of certain proscribed

aggravating factors.  See I.C. § 35-50-9-2.  Here, the jury recommended death sentences upon a finding that the sole aggravating circumstance of multiple killings outweighed the proffered mitigating circumstances.  The record shows Isom murdered his wife and his two, teenage step-children, who spent most of their lives with Isom as a father-figure.  All three victims were shot to death apparently unexpectedly and without provocation inside their home.  The autopsy of Cassandra's body revealed multiple gunshot wounds to her chest, abdominal region, and back.  The cause of her death was a shotgun blast to the top of her head evacuating her brain from her skull.  Michael also sustained multiple gunshot wounds and was killed by a shotgun blast to his chest.  Ci'Andria received eight separate entrance wounds to her body caused by three different weapons.  Each victim was shot multiple times at close range.

"We have usually regarded multiple murder as constituting weighty aggravation." McManus v. State, 814 N.E.2d 253, 266 (Ind. 2004); see also Corcoran v. State, 774 N.E.2d 495, 502 (Ind. 2002) (concluding that a quadruple killing was weightier than Defendant's proffered evidence in mitigation).  Further, this Court has determined that a defendant is deserving of an enhanced sentence under facts where "the nature of the killings are brutal."  Brown v. State, 10 N.E.3d 1, 5 (Ind. 2014) (quoting Taylor v. State, 840 N.E.2d 324, 341 (Ind. 2006)).  The record makes clear that the nature of the offense is a brutal triple murder Isom committed against his own family.

The character of the offender, rather than the nature of the offense, presents Isom's strongest support for revision.  In many ways, his background was pretty solid and unremarkable.  Dr. Parker's testimony for example revealed in part that Isom graduated from high school, had good family support, went to work after graduating from high school, and apparently was reasonably successful.  Isom had good educational accomplishment, minimal legal history, no prior psychiatric history, and he had not suffered from serious mental illness.  Further, Isom had a successful marriage for twelve years, provided for his family, and had no history of domestic violence.  According to Isom theses factors coupled with his lack of criminal history and incident-free term of incarceration weighs in favor of revising his sentence.  We disagree.  It appears to this Court that the nature of the offenses Isom committed far outweigh his otherwise favorable character.  Under the facts presented here we cannot say that Isom has met

his burden to show that the jury's unanimous recommendation, which the trial court properly imposed, was inappropriate.

## VII. Imposition of Consecutive Sentences

As previously indicated the jury recommended the death penalty for each of the three murder convictions. The court accepted the jury's recommendation and over Isom's objection ordered the three death penalties to be served consecutively. The trial court reasoned, "from a legal perspective and a practical perspective, each victim is entitled to their own sentence." Tr. at 13903. Isom claims error.[12]

A trial court cannot impose consecutive sentences in the absence of express statutory authority. Mask v. State, 829 N.E.2d 932, 935 (Ind. 2005). Indiana Code § 35-50-1-2(c), which governs the court's authority to impose such sentences, provides in relevant part "[e]xcept [for factors not pertinent here] the court shall determine whether *terms of imprisonment* shall be served concurrently or consecutively." (emphasis added). As we have explained:

> A "term of imprisonment" is a penalty under which the convict is sent to incarceration for some period (such as two years or five to ten years) and then released after the period has passed. Execution is a penalty of a radically different sort. It features incarceration only while appellate processes persist and does not contemplate a future release into society.

State v. Price, 715 N.E.2d 331, 332 (Ind. 1999). Accordingly, "the death penalty is not 'a term of imprisonment'" within the meaning of I.C. § 35-50-1-2. Id. In consequence the trial court here exceeded its statutory authority by ordering Isom's death sentences to be served consecutively.

---

[12] Neither Isom nor the State provides much in the way of analysis on this issue. Without citation to authority Isom's one page argument essentially boils down to "Kevin Isom cannot be put to death three times . . . ." Br. of Appellant at 68. In its one page response, also without citation to authority, the State asserts, "Defendant is not prejudiced or harmed by having three death sentences instead of one." Br. of Appellee at 64.

## Conclusion

We affirm Isom's convictions and remand this cause to the trial court with instructions to issue a new sentencing order consistent with this opinion.

Rush, C.J., and Dickson, David and Massa, JJ., concur.