## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 29 2019, 6:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Emilee L. Stotts
Huntington County Public Defender
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joseph Waldron,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | March 29, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1723<br><br>Appeal from the Huntington<br>Superior Court<br><br>The Honorable Jennifer E.<br>Newton, Judge<br><br>Trial Court Cause No.<br>35D01-1610-F1-192 |

**Brown, Judge.**

[1] Joseph Waldron appeals his convictions for battery with a deadly weapon as a level 5 felony, battery on a child as a level 5 felony, two counts of child molesting as level 1 felonies, and child molesting as a level 4 felony. Waldron raises one issue which we revise and restate as whether the trial court abused its discretion in denying his motion for mistrial. We affirm.

## Facts and Procedural History

[2] At the start of Waldron's jury trial on May 22, 2018, he faced the following charges for acts against his daughter, A.W., who was in kindergarten during the 2015-2016 school year: Count I, battery with a deadly weapon as a level 5 felony; Count II, battery on a child as a level 5 felony; Count III, child molesting as a level 1 felony; Count IV, child molesting as a level 1 felony; and Count V, child molesting as a level 4 felony. The State presented the testimony of seventeen witnesses, including A.W.'s teacher, the counselor at the school which A.W. attended, A.W.'s foster mother, A.W.'s half-sibling, and a sexual assault nurse examiner at the Fort Wayne Sexual Assault Treatment Center who conducted an interview with A.W. on June 7, 2016. A.W.'s teacher testified that, on the morning of May 10, 2016, A.W. had disclosed to her that her bottom hurt and during that day's school dismissal that "her dad got on her bottom with a taser." Transcript Volume II at 37. The sexual assault nurse examiner testified that A.W. had told her: that Waldron "tased [her] on the back when [she] was going potty" and "tased [her] again when [she] asked if something happened" and that it hurt and she was bleeding; that Waldron "stuck his private in [her] bottom" "[l]ots of times" and that it felt bad and

hurt; and that Waldron "made [her] put my mouth on his private" "[l]ots of times" and that she "almost puked from it." Transcript Volume IV at 23.

[3] On the fourth day of trial, Waldron presented his first witness, the principal at A.W.'s school from August 2002 until February 25, 2016. He testified that A.W. was "a student who loved to be at school . . . who struggled . . . academically . . . and at times, struggled, maybe, behaviorally," that she was sent to his office a few times for issues involving "another student, . . . not wanting to be with the group, wanting to be by herself, not follow[ing] the directions of the teacher," and that she was involved in a "couple incidents, maybe, where she was in the bathroom" and "she would put enough toilet paper in there that there would cause an issue." *Id.* at 97-99. Shortly after his testimony began, the court took a break to review a previously-entered child hearsay order pertaining to an objection about the principal's testimony.

[4] After a ten-minute recess, the court brought Juror No. 4 into the courtroom, and the following exchange occurred outside the presence of the other jurors:

> [The Court]: And you had told – you notified the, um, Bailiff at the close of our last break that the, um, witness, who was just on the stand, when we took the break, um, that you have a close friend, who's a resource teacher at [A.W.'s school], that disclosed information to you about – about him, um, about things that occurred during that time frame, is that correct?
>
> [Juror No. 4]: Yes, and in conversation of, you know, just visiting and I would ask her how things were going at school and she would just make comments regarding [the principal's] presence or lack of presence on several occasions. Now, I don't – I'm not – I

know that she worked there when he was there because she had worked at Re-Roanoke previously and was transferred to [A.W.'s school]. And, you know, as a Resource teacher she was to work with students that were having behavioral problems and on one-on-one and that type of thing. She never revealed any names or of students or anything but, you know, in conversation she would talk about things going at school. And that –

[The Court]: Anything that regards this case?

[Juror No. 4]: I have no idea, like I said, she –

[The Court]: Okay, nothing that connected it to this case that she said to you?

[Juror No. 4]: No, but – but she would just – just describe incidents that would happen at school and it sounds like some of these behaviors may have been related to [A.W.] but I do not know that and she did not say any specific names, but I don't – I don't want to do anything that is going to cause a mistrial or something like that and –

[The Court]: . . . I'm glad you let [the bailiff] know it as soon as you realized that. . . . [H]ave you stated any of that information in the presence of any of the other jurors?

[Juror No. 4]: We just talked about it –

[The Court]: You and [the bailiff]?

[Juror No. 4]: What I told [the bailiff]?

[The Court]: Yes.

[Juror No. 4]: We just discussed it as – in the room.

[The Court]: Who discussed it in the room?

[Juror No. 4]: Well, they asked me what it was about and I said –

[The Court]: Can you tell me what you told them exactly?

[Juror No. 4]: Exactly what I told you that I have a close personal friend who works at [A.W.'s school], and that's all I said.

[The Court]: Okay. You didn't tell them that – or did you tell them anything else other than you had a friend? Did you tell them anything about not being able to be objective to this witness?

[Juror No. 4]: I told them that I wasn't sure if I could be objective to this witness.

*Id.* at 104-106. Juror No. 4 indicated she had conveyed that her friend had relayed information regarding the principal, that she had not said anything to the jury "about thinking any of the information . . . from [her] friend was – had to do with [A.W.]," and that she "didn't go into any detail as to what was confided regarding him" to the jury. *Id.* at 106. When the court asked if she could set aside what she had heard from her friend and be objective as to how the facts pertain to the case, she stated, "[w]ell, as [the principal] was saying I don't remember, that – that's what brought all these conversations back to mind were things that she told me, that she had complaints as – ." *Id.* The court asked if she meant "like to him not being able to remember things," and she clarified, "[n]o, not remember things. Availability." *Id.*

[5] The State and Waldron's counsel also questioned Juror No. 4. *Id.* at 107. She answered in the negative when asked, "[w]hen you said you didn't go into any detail with the jurors, did you tell the jurors what your friend had told you" about the principal and when asked whether she went into detail with the jury about her concerns regarding the principal. *Id.* In answering the question of whether she told the jurors anything that would make them "either not believe

or have heightened belief" of the principal, Juror No. 4 stated, "I don't know, I may have rolled my eyes trying to think how I should – what I should respond" and "I don't know if any of my body language may have been interpreted as negative towards the witness, I don't know." *Id.* She indicated that when the jurors went into the jury room, she was the first one in and stayed by the door, the other jurors "went to their – they were standing" "around their chairs," and she "approached the Bailiff and . . . said I have some concerns." *Id.* at 108. She indicated that she and the bailiff were "very close together"; that she expressed that she felt like she needed to speak to the judge about the principal; and that, when the bailiff inquired into what she wanted to share, she had a quiet conversation with the bailiff and explained she "had a friend who [was employed at A.W.'s school] at this time [who] relayed information" regarding the principal and that she "wasn't sure [she] could be objective" "to this witness." *Id.* at 108-109. In response to being asked whether she believed any jurors were able to hear the conversation, she responded that she did not know.

[6] Waldron's counsel moved for a mistrial and argued that what the other jurors overheard from Juror No. 4's conversation with the bailiff was unascertainable and that the other jurors "may be tainted" by Juror No. 4's "inside information" regarding the principal. *Id.* at 110. His counsel stated, "[e]ven if her stating that she can't be objective, the logical conclusion would be then there must be a problem with this witness, and that problem could only be either credibility or non-credibility, they go hand and hand [sic]. If you can't be objective." *Id.* at 111. The court responded, "Correct, I believe it could be

either one," "but what I'm saying is it's not – he's not credible or it's not he is credible," and "the word objective leaves that open for debate." *Id.*

[7] Determining that it would question the jurors without examination by the parties, the court brought each juror into the courtroom individually and asked whether he or she overheard any specifics of the conversation between Juror No. 4 and the bailiff. Each juror besides Juror Nos. 12 and 38 responded in the negative to the court's inquiry. Juror No. 12 indicated:

> Um, no pacifics [sic], just that she has a friend that used to either work at [A.W.'s school] or worked in the school system, that she has previously had a conversation of this incident but she was just now aware when [the principal] was giving his testimony that it all came together to her about what she was talking about back at [A.W.'s school] with the incident.

*Id.* at 115. The court asked Juror No. 12 whether Juror No. 4 shared any specifics about any incidents, and Juror No. 12 stated, "[n]o, there were no pacifics [sic] and no names given of what she told." *Id.* Juror No. 38 stated, "the only thing I heard was that she knew [the principal] and that there was, uh, she had information from a co-worker" and "[t]hat's the only thing I heard." *Id.* at 120.

[8] The court asked whether Waldron wished for Juror No. 4 to be dismissed, and his counsel answered affirmatively and renewed his request for a mistrial. After the request was denied, Waldron's counsel stated, "then, yes, we would be fine with striking" Juror No. 4. *Id.* at 121. The court dismissed Juror No. 4 and, in addressing the jury collectively, stated:

We did excuse Juror #4, she didn't do anything wrong, it wasn't that . . . just sometimes during the court [sic] of a trial, there's so many witnesses and I know when we're going through . . . the jury selection process, the attorneys are asking all these questions about people you know, . . . and sometimes you just don't realize certain events until they occur. So . . . it's one of the reasons we have alternates. So, I will – I do just want to admonish you that if you . . . heard any – if you did over hear anything, and I know I asked each of you individually . . . that you just . . . not consider any of that. Not discuss any of that with any of your fellow jurors and just resume as though that . . . information never occurred[.]

*Id.* at 123. At the conclusion of the trial, the jury found Waldron guilty as charged.

## *Discussion*

[9] The issue is whether the trial court abused its discretion in denying Waldron's motion for mistrial. "[A] mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Isom v. State*, 31 N.E.3d 469, 481 (Ind. 2015) (quoting *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001)), *reh'g denied*, *cert. denied*, 136 S. Ct. 1161 (2016). The Indiana Supreme Court has explained:

A trial court is in the best position to evaluate whether a mistrial is warranted because it can assess first-hand all relevant facts and circumstances and their impact on the jury. We therefore review denial of a motion for mistrial only for abuse of discretion. However, the correct legal standard for a mistrial is a pure question of law, which we review de novo.

*Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014) (citations omitted).

[10] "An impartial jury is the cornerstone of a fair trial, guaranteed by the Sixth Amendment and Article 1, Section 13 of our Indiana Constitution." *Id.* at 936. "Defendants seeking a mistrial for suspected jury taint are entitled to the presumption of prejudice only after making two showings, by a preponderance of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury." *Id.* at 939 (citing *Currin v. State*, 497 N.E.2d 1045, 1046 (Ind. 1986)). On the other hand, if a defendant fails to make the initial two-part showing, the presumption does not apply. *Id.* "Instead, the trial court must apply the probable harm standard for juror misconduct, granting a new trial only if the misconduct is 'gross and probably harmed' the defendant." *Id.* (quoting *Henri v. Curto*, 908 N.E.2d 196, 202 (Ind. 2009)).

[11] Waldron maintains that he showed by a preponderance of the evidence that a prohibited extra-judicial conversation occurred between Juror No. 4 and the bailiff. He contends extra-judicial contact and communication occurred during the course of his trial and asserts that:

> [Juror No. 4's] statements in response to the court coupled with the fact that two jurors overheard this conversation when questioned by the trial court satisfies by preponderance of the evidence that there was a conversation between the bailiff and [Juror No. 4] that this extrajudicial communication occurred and that the communication pertained to the matter of a witness for the appellant in his case in chief.

Appellant's Brief at 13.

[12] To the extent that Waldron argues he is entitled to a presumption of prejudice based on Juror No. 4's conversation with the bailiff in the jury room, he does not develop an argument that extra-judicial contact or communications occurred between jurors and unauthorized persons. Our review of the record reveals that, as soon as she realized that she had prior information about a witness, Juror No. 4 informed the bailiff. Specifically, when the court took a ten-minute break from the witness's testimony, Juror No. 4 entered the jury room, approached the bailiff, and expressed that she had some concerns and felt like she needed to speak to the judge. We do not find that Waldron is entitled to a presumption of prejudice under these circumstances.

[13] We turn to the probable harm standard for juror misconduct and will grant a new trial only if the misconduct is "gross and probably harmed" the defendant, which we review for an abuse of discretion. *See Henri*, 908 N.E.2d at 202. Waldron contends that, "since this improper conversation took place prior to the witness testifying, one cannot know the extent that it tainted the jurors," and highlights "the total circumstances of [Juror No. 4's] body language in conjunction with the conversation with the bailiff." Appellant's Brief at 13-14.

[14] We find that Juror No. 4's conduct did not constitute gross misconduct. This Court found that a juror's misconduct was gross and probably harmed the defendant in *Dickenson v. State*, 732 N.E.2d 238 (Ind. Ct. App. 2000). In that case, during *voir dire*, a potential juror was asked whether she had a relationship

with the defendant or potential witnesses that would affect her ability to be an impartial juror, and she "did not acknowledge that she had such a relationship with Dickenson, who had been her neighbor during childhood" and instead "stated that she knew a few of the potential witnesses, but that her ability to weigh the testimony of those witnesses would not be affected." 732 N.E.2d at 240. She also did not respond when asked whether she had prior knowledge about the facts of the case. *Id.* The potential juror was chosen as a juror, and, following the verdict of guilty, a member of Dickenson's family recognized her while she was being examined. *Id.* Further investigation, the submission of affidavits, and the testimony of four witnesses revealed that the juror "had lied about her relationship to . . . the victim's wife, and her pre-trial knowledge of the case." *Id.* On appeal from the denial of the defendant's petition for post-conviction review, this court reversed and ordered a new trial, concluding that the juror's act of lying during *voir dire* constituted juror misconduct and that "because the evidence reveals that [the juror] had knowledge of the case prior to trial, and was friendly with the victim's wife, who testified at trial . . . the misconduct was gross and probably harmed the defendant." *Id.* at 242.

[15] Here, by contrast, there is no indication that Juror No. 4 lied or otherwise made misrepresentations. When the principal testified, Juror No. 4 became aware of who he was and that they shared a personal connection, and she approached the bailiff to discuss her concerns. When the court learned of her concerns, it questioned Juror No. 4 and determined that it would question the other jurors. The record reveals that all of the jurors indicated that they did not hear specifics

of Juror No. 4's conversation with the bailiff. Juror No. 38 stated that she only heard that Juror No. 4 knew the principal and "that there was, uh, she had information from a co-worker." Transcript Volume IV at 120. The court removed Juror No. 4 and admonished the jury to not discuss what they heard and to resume as though the information never occurred.

[16] Based on the foregoing, we cannot say that the trial court abused its discretion when it denied Waldron's motion for mistrial. *See Henri*, 908 N.E.2d at 202-204 (holding that the defendant failed to show misconduct which was gross and probably harmed the defendant based upon claims that one juror's receipt of a cell phone call created pressure to reach a hasty verdict, and that the alternate juror communicated with the regular jurors during deliberations).

### *Conclusion*

[17] For the foregoing reasons, we affirm Waldron's convictions.

[18] Affirmed.

Bailey, J., and Bradford, J., concur.