## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 17 2020, 10:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Brian Woodward
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela N. Sanchez
Assistant Section Chief, Criminal
Appeals
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Major Loren Wilson,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | February 17, 2020<br><br>Court of Appeals Case No.<br>19A-CR-1605<br><br>Appeal from the Lake Superior<br>Court<br><br>The Honorable Diane Ross<br>Boswell, Judge<br><br>Trial Court Cause No.<br>45G03-1403-FA-10 |

**Brown, Judge.**

[1] Major Loren Wilson appeals his convictions and sentence for two counts of criminal deviate conduct as class B felonies, burglary as a class B felony, and criminal confinement as a class D felony. He raises five issues which we restate as:

    I.    Whether the trial court abused its discretion by admitting certain evidence;

    II.    Whether the court abused its discretion in denying his motion for mistrial;

    III.    Whether the evidence was sufficient to sustain his conviction for burglary;

    IV.    Whether his convictions for criminal deviate conduct violate the prohibition against double jeopardy; and

    V.    Whether the court abused its discretion in sentencing him.

We affirm.

### Facts and Procedural History

[2] In 2014, Phyllis Harris lived in an apartment in East Chicago, Indiana, with her twenty-five-year-old daughter, T.R. At some point, Wilson became a new resident in the apartment directly below Harris's apartment. When he first moved in, he knocked on Harris's door and asked if he could "hook his electricity up to [theirs] because his wasn't on yet." Transcript Volume III at 18. Wilson would often come up to Harris's apartment bringing Valentine cards, videos, and "things like that." *Id.* at 19. T.R. had friendly and neighborly interaction with Wilson, and Harris considered him to be a friend.

[3]     On March 4, 2014, Harris left for work at 1:00 a.m., closed the door, and locked it. T.R. was in her bedroom watching TV and realized she was not alone when the door to her room creaked open. A man wearing a black ski mask and latex gloves stepped into the room. He told her to lie on her back, and she complied. He also told her to "turn the TV off so it could be pitch black." *Id.* at 64. She turned off the TV and looked at her cell phone, and the man "slammed it." *Id.* at 65. He told her to remove her clothes, and she did so. He told her to flip over, and she complied. He removed his glove and placed two fingers in her vagina. He asked her if she wanted him to perform oral sex, and "of course [she] said 'Yes' because – you know, for survival." *Id.* at 68. He removed the mask covering his mouth and put his tongue in her vagina. T.R. knew the man was Wilson because she recognized his voice. He said, "The next time won't be so lucky." *Id.* at 71. He made her follow him to the bathroom and told her to wash her private area, and she did so. He asked her if she wanted him to stay, and she replied, "No." *Id.* at 72. Wilson left, and T.R. heard him walk down the creaky stairs back to his apartment.

[4]     T.R. did not call the police because she was afraid Wilson would come back and know that she called the police and also because she "couldn't have [her] phone because it was behind the bed, so [she] didn't have access to it." *Id.* at 73. Later that morning, Wilson came to her door, T.R. opened it and was shocked to see him, and he gave her a note and told her "not to tell anybody." *Id.* at 74. The note read: "[T.], As I said, don't say anything to anyone, not

even your mother." State's Exhibit 11. Wilson left, and she closed and locked the door.

[5] Harris returned home around 10:30 a.m., saw Wilson and his dog outside, made small talk with him, went into her apartment, and found T.R. who looked like she was about to cry. T.R. told Harris what had happened. Harris walked over to the window, saw Wilson, and told him she knew what he did and she was going to call the police. Wilson went up to her apartment and asked "how does she know it was me?" *Id.* at 25. Harris called 911.

[6] East Chicago Police Officer Garrick Manley responded to the scene and spoke to Harris who seemed to be "pretty upset." *Id.* at 105. When he approached T.R., she was crying and shaking non-stop. He waited a few minutes and, once T.R. calmed down, she told him she was assaulted by Wilson who resided in the apartment below her.

[7] The police discovered a box of latex gloves, a used pair of latex gloves on a nightstand, notebook paper, and a ski mask in Wilson's apartment. At some point, Wilson provided a handwriting exemplar. Courtney Baird, a forensic document unit supervisor employed by the Indiana State Police Laboratory Division, compared the exemplar against the note and concluded that it was probable that Wilson wrote the note to T.R.

[8] On March 6, 2014, the State charged Wilson with Count I, criminal deviate conduct as a class A felony; Count II, criminal deviate conduct as a class B felony; Count III, criminal deviate conduct as a class B felony; Count IV,

criminal confinement as a class B felony; Count V, burglary as a class B felony; Count VI, burglary while armed with a deadly weapon as a class B felony; Count VII, battery by means of a deadly weapon as a class C felony; Count VIII, sexual battery as a class C felony; Count IX, sexual battery as a class D felony; and Count X, criminal confinement as a class D felony.[1] The State later amended the information to add the allegation that he was an habitual offender.

[9] In May 2019, the court held a retrial.[2] T.R. testified and identified Wilson as the person who entered her apartment. She also testified that Wilson had a knife when he entered her bedroom, placed the knife to her throat, and later dragged it across her body.

[10] Harris testified that she returned home, talked to Wilson, went into her apartment, and found T.R. who looked like she was about to cry. The prosecutor asked: "And without telling us exactly what she said, why was she about to cry?" Transcript Volume III at 24. Harris answered: "Something happened." *Id.* Wilson's counsel objected on the basis of hearsay. The

---

[1] Counts I, IV, VI, VII, and VIII referred to a knife.

[2] A jury initially found Wilson guilty as charged, and Wilson admitted to being an habitual offender. The court vacated the convictions for Counts II, III, IV, V, VII, VIII, IX, and X. On appeal, Wilson argued the State did not present sufficient evidence to support his conviction for burglary as a class B felony. *Wilson v. State*, No. 45A03-1412-CR-425, slip op. at 2 (Ind. Ct. App. August 11, 2015), *trans. denied*. This Court affirmed. *Id.* In August 2016, Wilson filed a petition for post-conviction relief. On appeal, this Court held that Wilson received ineffective assistance of appellate counsel and reversed and remanded for further proceedings. *Wilson v. State*, 94 N.E.3d 312, 315 (Ind. Ct. App. 2018). Specifically, the Court found the performance of Wilson's appellate counsel was deficient by not raising the issue of whether Wilson knowingly, voluntarily, and intelligently waived his right to counsel. *Id.* at 321-323.

prosecutor stated: "Judge, the effect on the listener is an exception to hearsay, and Ms. Harris takes certain actions subsequent that are important for describing this case to the jury, namely, a 911 call and her future interactions with the defendant." *Id.* The court overruled the objection. She testified she learned that Wilson attacked T.R. in the apartment. When she stated she told Wilson that T.R. told her what happened, Wilson's counsel objected on the basis of hearsay, and the court sustained the objection.

[11] Officer Manley testified that T.R. was crying and shaking non-stop, he waited a few minutes to allow her to calm down before asking what happened, and, "[o]nce she calmed down," she said she was assaulted by Wilson. *Id.* at 108. Wilson's counsel objected on the basis of hearsay. The prosecutor indicated that a foundation had been laid for an excited utterance, and the court overruled the objection.

[12] During the direct examination of Jerry Lewis, a crime scene investigator with the East Chicago Police, the prosecutor asked about the contact he had with Wilson, and Lewis stated: "I was by Detective Velez. We received a phone call in regards to me being requested to come down to Lake County Jail facilities to take a buccal swab, and a buccal swab would have been me actually taking a DNA sample." *Id.* at 183. Defense counsel objected, moved for a mistrial, and argued the jury became aware that Wilson was at the Lake County Jail. After some discussion, the court stated that Lewis's testimony did not indicate when he was at the Lake County Jail and the testimony was not so prejudicial as to

warrant a mistrial. Defense counsel asked for a curative instruction, and the court told the jury to disregard Lewis's last statement.

[13] Kimberly Anderson, a forensic scientist in the Biology Unit at the Indiana State Police Lowell Regional Lab, testified that her initial test revealed a piece of toilet paper found inside the underwear in the evidence collection kit contained a major DNA profile consistent with T.R. and a minor DNA profile consistent with Wilson's DNA and "[a]ssuming the minor result originated from a single individual, the alleles detected [were] consistent with Major Wilson and [were] estimated to occur once in 76 million unrelated individuals."[3] Transcript Volume IV at 165-166. She testified that she analyzed the toilet paper again in 2018 and concluded "[t]he DNA profile obtained from the previously extracted sample of the toilet paper was interpreted as originating from two individuals," "[t]he DNA profiled is 14 million times more likely if it originated from [T.R.] and Major Wilson than if it originated from [T.R.] and an unknown, unrelated individual," and "[t]his analysis provides very strong support for the proposition that Major Wilson is a contributor to the DNA profile." *Id.* at 172.

[14] After the State rested, Wilson's counsel moved for judgment of acquittal, and the court denied the motion. The jury found Wilson guilty of Count II, criminal deviate conduct as a class B felony, Count III, criminal deviate

---

[3] When asked to explain the difference between a major profile and a minor profile, Anderson stated that in a sample in which two individuals contribute unequal amounts of DNA to the sample, the one that is contributing more is considered the major, and the one that is contributing less is the minor.

conduct as a class B felony, Count V, burglary as a class B felony, Count IX, sexual battery as a class D felony, and Count X, criminal confinement as a class D felony, and not guilty of the remaining counts. Wilson pled guilty to being an habitual offender.

[15] The court vacated Wilson's conviction for Count IX, sexual battery as a class D felony, which it found merged with Count III. The court found Wilson's prior criminal history, his likelihood of committing a similar crime, the nature and circumstances of the crime, and his position of trust with the victim's family as aggravating circumstances. The court stated: "Mr. Wilson was – while not a caretaker or a person of any responsibility for this young lady, he was a friend of the family and trusted by the family . . . ." Sentencing Transcript at 26-27. The court sentenced him to twenty years for Count II enhanced by twenty-five years for his status as an habitual offender, twenty years for Count III, twenty years for Count V, and two and one-half years for Count X. The court ordered the sentences be served consecutively for an aggregate sentence of 87.5 years.

*Discussion*

I.

[16] The first issue is whether the trial court abused its discretion by admitting Officer Manley's testimony that T.R. stated she was assaulted by Wilson and Harris's testimony regarding T.R.'s statements. Wilson argues that T.R.'s statements to Officer Manley did not qualify as an excited utterance. He appears to contend that the admission of Harris's testimony regarding T.R.'s

statements was admitted based upon the effect on the listener, the effect upon Harris was irrelevant to the charges faced by him, the effect upon her failed to meet the basic test of relevancy, and Harris's testimony unduly prejudiced him.

[17] The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). A trial court's ruling on the admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* at 1059. An improper admission is harmless if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

[18] Even if the admission of the challenged testimony was improper, the admission of the statements was cumulative of T.R.'s testimony and harmless. *See Davenport v. State*, 749 N.E.2d 1144, 1149 (Ind. 2001) (holding that even if admission of testimony under the excited utterance exception was erroneous, the admission was cumulative and harmless), *reh'g denied*.

## II.

[19] The next issue is whether the trial court abused its discretion in denying Wilson's motion for mistrial. Wilson argues that Lewis's testimony regarding

taking a buccal swab at the Lake County Jail facilities impaired his presumption of innocence and resulted in unfair prejudice.

[20] "[A] mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Isom v. State*, 31 N.E.3d 469, 481 (Ind. 2015) (quoting *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001)), *reh'g denied*, *cert. denied*, 136 S. Ct. 1161 (2016). The Indiana Supreme Court has explained:

> A trial court is in the best position to evaluate whether a mistrial is warranted because it can assess first-hand all relevant facts and circumstances and their impact on the jury. We therefore review denial of a motion for mistrial only for abuse of discretion. However, the correct legal standard for a mistrial is a pure question of law, which we review de novo.

*Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014) (citations omitted).

[21] The record reveals that, when asked to describe the nature of his contact with Wilson, Lewis testified: "I was by Detective Velez. We received a phone call in regards to me being requested to come down to Lake County Jail facilities to take a buccal swab, and a buccal swab would have been me actually taking a DNA sample." Transcript Volume III at 183. After some discussion, the trial court stated that Lewis's testimony did not indicate when Wilson was at the Lake County Jail and did not imply that Wilson was still in custody. Further, the court told the jury to disregard Lewis's last statement. We cannot say the trial court abused its discretion when it denied Wilson's motion for mistrial. *See Jackson v. State*, 518 N.E.2d 787, 789 (Ind. 1988) (acknowledging that,

generally, the admission of evidence of prior criminal history is error; observing that the reference was fragmentary and inadvertent and there was no attempt by the prosecutor to elicit the information; and holding the evidence was not so close that the jury could have been influenced by the error and the trial court properly denied the motions for mistrial).

III.

[22] The next issue is whether the evidence is sufficient to sustain Wilson's conviction for burglary. Wilson argues there was no evidence which would permit the jury to infer that a breaking occurred and asserts the investigating officers noted there was old damage to the door but no sign of forced entry.

[23] When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.*

[24] At the time of the offense, Ind. Code § 35-43-2-1 provided that a person who breaks and enters the building or structure of another person, with intent to commit a felony in it, commits burglary and that the offense is a class B felony if it is committed while armed with a deadly weapon; or the building or structure is a dwelling or structure used for religious worship. "Using even the slightest force to gain unauthorized entry satisfies the breaking element of the

crime." *Davis v. State*, 770 N.E.2d 319, 322 (Ind. 2002), *reh'g denied*. "For example, opening an unlocked door or pushing a door that is slightly ajar constitutes a breaking." *Id.*

[25] Harris testified that she closed the door behind her and locked it when she left for work. On cross-examination, she indicated she did not notice anything strange about her door but when asked if it looked like the door had been tampered with, she answered "[a] little." Transcript Volume III at 39. T.R. testified that, after Harris left, she realized she was not alone and she did not let the person into the apartment. She later indicated she did not open the door for anyone or unlock the door.

[26] To the extent Wilson requests that we judge the credibility of the witnesses and reweigh evidence, we will not do so. *See Jordan*, 656 N.E.2d at 817. Based upon the record, we conclude the State presented evidence of probative value from which the jury could have found Wilson guilty beyond a reasonable doubt of burglary as a class B felony. *See Cockerham v. State*, 246 Ind. 303, 307-308, 204 N.E.2d 654, 657 (1965) ("The jury, from the facts here, could reasonably conclude from the evidence that no one could enter the home with the windows and doors locked and closed without opening such doors or windows. This would constitute a 'breaking' even though there be no physical marks showing that force was used. As a matter of logic, no one could conclude otherwise than that a door or window had to be pushed open to get inside the house.").

## IV.

The next issue is whether Wilson's convictions for criminal deviate conduct violate the prohibition against double jeopardy. The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." Ind. Const. art. 1, § 14. The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999).

Wilson admits there were two separate acts which may have satisfied the elements of criminal deviate conduct but asserts the State did not elect which acts it was relying upon to prove criminal deviate conduct in each of the respective counts.

Under the actual evidence test, the evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. *Lee v. State*, 892 N.E.2d 1231, 1234 (Ind. 2008). To show that two challenged offenses constitute the "same offense" in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense. *Id.* The Indiana Supreme Court has determined the

possibility to be remote and speculative and therefore not reasonable when finding no sufficiently substantial likelihood that the jury used the same evidentiary facts to establish the essential elements of two offenses. *Hopkins v. State*, 759 N.E.2d 633, 640 (Ind. 2001) (citing *Long v. State*, 743 N.E.2d 253, 261 (Ind. 2001), *reh'g denied*; *Redman v. State*, 743 N.E.2d 263, 268 (Ind. 2001)). "[U]nder the . . . actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." *Spivey v. State*, 761 N.E.2d 831, 832-833 (Ind. 2002).

[30]  During closing argument, the prosecutor stated: "[T.R.] told you two forms of sexually deviate conduct. Now what those are is that he performed oral sex on her. That's the first one, meaning that he used his tongue to penetrate her vagina. The second form is using his fingers." Transcript Volume V at 29-30. She later stated:

> Let's go to Counts II and III. Exact same thing we talked about but you don't need a knife anymore. So this one does not require – or, I'm sorry, this one doesn't require the same as the other one. You're taking some things out. Same thing: Digital penetration, oral penetration.

*Id.* at 30-31. During rebuttal, she asserted: "[Wilson's] DNA happened to be in her vagina and her underwear after she said that he performed oral sex on her and vaginally penetrated her . . . ." *Id.* at 63.

[31] Based upon the evidence presented, including only two incidences of criminal deviate conduct, the jury's finding of guilt on both charges, and the prosecutor's statements during closing argument, we find no sufficient substantial likelihood, and thus no reasonable possibility, that the trier of fact based its determination of guilt on the same evidentiary facts to establish the essential elements of two offenses.

V.

[32] The next issue is whether the trial court abused its discretion in sentencing Wilson. Wilson argues the trial court's determination that he violated a position of trust was erroneous as a matter of law because there was no evidence he abused any trust. He contends the court did not offer an explanation that the nature and circumstances went beyond the statutory requirements, using his likelihood to reoffend as a separate aggravator was error, and the court did not engage in any evaluative process as to why his prior criminal history would warrant an aggravated sentence.

[33] We review the sentence for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. An abuse of discretion occurs if the decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.* A trial court abuses its discretion if it: (1) fails "to enter a sentencing statement at all;" (2) enters "a sentencing statement that explains reasons for imposing a sentence – including a finding of

aggravating and mitigating factors if any – but the record does not support the reasons;" (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration;" or (4) considers reasons that "are improper as a matter of law." *Id.* at 490-491. If the trial court has abused its discretion, we will remand for resentencing "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id.* at 491. The relative weight or value assignable to reasons properly found, or those which should have been found, is not subject to review for abuse of discretion. *Id.* We will examine both the written sentencing order and the trial court's comments at the sentencing hearing to determine whether the trial court adequately explained the reasons for the sentence. *Powell v. State*, 751 N.E.2d 311, 315 (Ind. Ct. App. 2001). A single aggravator is sufficient to support an enhanced sentence. *See Trusley v. State*, 829 N.E.2d 923, 927 (Ind. 2005).

[34] When asked to describe her relationship with Wilson, T.R. answered: "It wasn't personal, just neighborly." Transcript Volume III at 58. When asked if she felt like she had to be nice to Wilson, T.R. answered: "No. I was just like neighborly saying 'Hi' and, you know, being a friend so . . . ." *Id.* at 59. When asked if Wilson ever knocked on her door and she did not answer it, she answered: "No, I always answered it because, you know, he was just neighbor, so I was being nice." *Id.* at 60. On cross-examination, T.R. testified she had previously had friendly and neighborly interactions with Wilson. Harris testified Wilson brought Valentine cards, videos, and "things like that." *Id.* at

19. She also testified that Wilson would often come up to her apartment and she considered him a friend. The sentencing order states "[t]he defendant was in a position of trust with the victim's family," Appellant's Appendix Volume III at 139, and the court explained at the sentencing hearing: "Mr. Wilson was – while not a caretaker or a person of any responsibility for this young lady, he was a friend of the family and trusted by the family . . . ." Sentencing Transcript at 26-27. We cannot say that the court abused its discretion with respect to this aggravator.[4]

[35] With respect to his criminal history, the presentence investigation report ("PSI") reveals that Wilson was charged with breaking and entering with intent to commit petty larceny in Florida in 1969,[5] pled guilty to burglary as a felony in 1971, pled guilty to rape and two counts of burglary as felonies under three separate cause numbers in 1973, committed parole violations in 1981, was convicted of burglary as a felony in 1981, pled guilty to residential burglary as a felony in 1988, pled guilty to burglary as a felony in 1992, pled guilty to conversion as a misdemeanor in 2003, and was convicted of burglary as a felony in 2003. Wilson was on parole at the time he committed the current

---

[4] In addition to the court's finding that Wilson was a friend of the family and trusted by the family, the court also found the nature and circumstances of the crimes as an aggravator. As mentioned above, a single aggravator is sufficient to support an enhanced sentence. *See Trusley*, 829 N.E.2d at 927.

[5] The PSI does not reveal a disposition.

offenses. We cannot say the court abused its discretion by finding his criminal history as an aggravator.

[36] As for the likelihood to reoffend, the Indiana Supreme Court has held that, absent a jury determination or an admission by the defendant, a judicial conclusion that a defendant is likely to reoffend cannot serve as an aggravating circumstance separate from the defendant's prior convictions. *Williams v. State*, 838 N.E.2d 1019, 1021 (Ind. 2005). Rather, such a statement is more properly characterized as a legitimate observation about the weight to be given to the prior convictions aggravator. *Id. Williams*, however, was based upon the presumptive sentencing scheme, not the advisory scheme applicable in this case, so there is some question as to whether it still applies. *See McMahon v. State*, 856 N.E.2d 743, 751 n.8 (Ind. Ct. App. 2006) (observing that, although criminal history and fact of unsuccessful attempts at rehabilitation could not be used as separate aggravators under presumptive sentencing scheme, claim of error on this ground is not available to defendants sentenced under advisory sentencing scheme). Even assuming the court might have abused its discretion by treating Wilson's likelihood to reoffend as a separate aggravating circumstance, it is unnecessary to remand for resentencing because we are convinced the trial court would have imposed the same sentence even without this aggravator. *See Edrington v. State*, 909 N.E.2d 1093, 1101 (Ind. Ct. App. 2009) (observing that it is proper to affirm sentence where an improper aggravator is considered, if we have "confidence the trial court would have imposed the same sentence" regardless), *trans. denied*. Wilson's criminal history

consists of eight prior felonies including rape and multiple counts of burglary. We find no abuse of discretion in the trial court's sentencing.

## *Conclusion*

[37]  For the foregoing reasons, we affirm Wilson's convictions and sentence.

[38]  Affirmed.


Baker, J., and Riley, J., concur.