

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 24S-CR-150



**FILED**
May 02 2024, 10:10 am
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

## Dustin A. Lane,
*Appellant (Defendant below)*

–v–

## State of Indiana,
*Appellee (Plaintiff below)*

---

Argued: November 8, 2023 | Decided: May 2, 2024

Appeal from the Lawrence Superior Court
No. 47D01-2201-CM-113
The Honorable John M. Plummer, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 22A-CR-2276

---

**Opinion by Justice Goff**

Chief Justice Rush and Justice Slaughter concur.
Justice Molter dissents with separate opinion in which Justice Massa joins.

**Goff, Justice.**

Indiana Appellate Rule 7(B) permits reviewing courts to revise a criminal sentence that is "inappropriate in light of the nature of the offense and the character of the offender." The defendant in this case received an aggregate sentence of more than eight years for ten misdemeanors he committed by sending letters from prison to his former partner, while serving time after a domestic battery and in violation of a no-contact order. Generally, we encourage Indiana trial courts to use the full range of rehabilitation options when sentencing defendants for misdemeanors and low-level felonies. However, we defer to a trial court's decision that a lengthy sentence of incarceration for such offenses is necessary to protect victims and the community from an offender with a history of violence. Such deference is due here and, accordingly, we affirm the sentence.

## Facts and Procedural History

Dustin Lane was convicted in 2019 of Level 6 felony domestic battery resulting in moderate bodily injury to his ex-wife, A.N., who had suffered years of domestic and emotional abuse at Lane's hands.[1] Lane's criminal record also includes a Level B felony for dealing methamphetamine; Class D felonies for sexual misconduct with a minor, maintaining a common nuisance, and criminal recklessness; a Level 5 felony for criminal confinement resulting in bodily injury; and a Level 6 felony for possession of methamphetamine.[2]

As a result of Lane's domestic-battery conviction, the trial court sentenced him to a term in the Department of Correction (or DOC) and entered a no-contact order prohibiting him from contacting A.N. directly

---

[1] *See* Ind. Code § 35-42-2-1.3(b)(3) (2016).

[2] *See, respectively*, I.C. § 35-48-4-1.1(a)(1) (2006); I.C. § 35-42-4-9(b) (1998); I.C. § 35-48-4-13(b)(2) (2001); I.C. § 35-42-2-2(c)(2) (2003); I.C. § 35-42-3-3(b)(1)(C) (2013); I.C. § 35-48-4-6.1(a) (2014).

or indirectly.[3] Despite these measures, Lane sent a series of letters to A.N. from prison between March 2020 and September 2021. A.N. initially sent several letters to Lane in response but eventually stopped responding. The content of these written communications often involved family matters, with Lane giving input on raising their children and asking that their daughter take driving lessons and pick him up on his day of release. The emotional tone of Lane's letters oscillated, conveying sometimes love, apologies, commitment, forgiveness, and promises of reform, but other times criticism and accusations of abuse. These letters, A.N. later testified, were part of a "cycle" of "manipulation tactics" that she had "seen through the years of the domestic abuse." Tr. Vol. II, p. 41. This history of abuse included Lane threatening to kill A.N. and her family.

Several months after Lane's last letter, A.N. reported his violations of the no-contact order to the police. The State, in response, charged Lane with ten counts of Class A misdemeanor invasion of privacy—one count for each of ten letters he sent to A.N. (although there are fourteen letters in the record).[4] Lane pled guilty to all counts without a plea agreement. The trial court—though not required to—identified Lane's history of violent criminal behavior as an aggravating factor and his acceptance of responsibility as a mitigating factor. It then sentenced Lane to ten 300-day sentences, each to run consecutively for an aggregate 3,000-day, fully executed, sentence.[5] Because Lane admitted to violating his domestic-battery probation by committing his new offenses, the trial court revoked the 730 days of Lane's suspended sentence in that case, which Lane must serve consecutively to the 3,000-day sentence. Lane is serving the misdemeanor sentence in the DOC pursuant to a request from the county sheriff under Indiana Code section 35-38-3-3(b)(3)(A).

---

[3] *See* I.C. § 35-38-1-30 (2008).

[4] *See* I.C. § 35-46-1-15.1(a)(12) (2019).

[5] Each of the ten sentences fell below the one-year maximum for a single count. *See* I.C. § 35-50-3-2 (1977).

Lane received permission to file a belated appeal, then challenged his 3,000-day sentence, claiming it was inappropriate in light of the nature of the offenses and his character. In a published opinion, a majority of the Court of Appeals panel agreed. *Lane v. State*, 211 N.E.3d 551, 553 (Ind. Ct. App. 2023). Despite finding nothing in Lane's character to warrant relief, the majority deemed the sentence inappropriate considering the nature of his offenses. *Id.* at 554. Lane's letters were "nonthreatening and primarily revolved around" the children, the majority explained, adding that A.N. encouraged a dialogue by responding to Lane's letters and that she failed to report Lane's violations of the no-contact order until several months after his last letter. *Id.* at 555. Characterizing the sentence as "an outlier that simply cannot stand," the court remanded with instructions to impose fully concurrent sentences for an aggregate 300-day term. *Id.* at 556.

In a sixteen-page dissent, Judge Kenworthy disagreed with the majority's assessment of the offenses, noting Lane's "relentless" violence and intimidation towards A.N. and the cycle of manipulation perpetuated by the letters. *Id.* at 556–57. In Judge Kenworthy's view, the majority focused too much on A.N.'s conduct without appreciating "the protective effect of a no-contact order in these emotionally fraught scenarios." *Id.* at 560.

We now grant transfer, thus vacating the opinion of the Court of Appeals. *See* Ind. Appellate Rule 58(A).

## Standard of Review

The core principles of 7(B) review are well settled. We recognize sentencing as "principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). This deference prevails "'unless overcome by compelling evidence portraying in a positive light the nature of the offense' and 'the defendant's character.'" *Oberhansley v. State*, 208 N.E.3d 1261, 1267 (Ind. 2023) (quoting *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015)). Our role is primarily to "leaven the outliers" and identify

"guiding principles" for sentencers, rather than to achieve the "perceived 'correct' result" in each case. *Cardwell*, 895 N.E.2d at 1225. As such, we "focus on the forest—the aggregate sentence—rather than the trees— consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.* Ultimately, we rely on our "collective judgment as to the balance" of all the relevant considerations involved, which include "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id.* at 1224, 1226.

# Discussion and Decision

Article Seven, Section Four of the Indiana Constitution grants this Court the power "to review and revise the sentence imposed" in all criminal appeals.[6] This authority, as implemented through Appellate Rule 7(B), allows an appellate court, "after due consideration of the trial court's decision," to find "that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

Our Rule 7(B) jurisprudence reflects a continuing effort to define the proper role for appellate sentence review within Indiana's criminal-justice system. In *Serino v. State*, we noted that judicial discretion to deviate from a standard sentence based on aggravating or mitigating factors produced "widely varying sentences for similar crimes." 798 N.E.2d 852, 854 (Ind. 2003). Accordingly, we cast Rule 7(B) as a "chance to review the matter in a climate more distant from local clamor" and work toward a goal of "similar sentences" for "perpetrators committing the same acts who have the same backgrounds." *Id.* at 854, 856–57. And, in *Cardwell*, we likewise envisioned Rule 7(B) as a tool to address "perceived unfairness" between sentences in a system that, unlike the federal sentencing guidelines, did not proceed by the "mechanical application of an array of factors." 895

---

[6] The Indiana Court of Appeals exercises similar authority in criminal cases, "to the extent provided by rule." Ind. Const. art. 7, § 6.

N.E.2d at 1223. Today, we advance our 7(B) jurisprudence by setting sentence review in the context of the policies and sentencing options that emerged from recent reforms to Indiana's criminal-justice system.

This opinion proceeds in three stages. First, we set out the broad policy context of sentence review, explaining the range of options trial courts have for sentencing a misdemeanor or low-level felony offender. Second, we clarify that defendants may argue that their sentences are inappropriate based on either the nature of their offenses or their character alone. Finally, we evaluate Lane's sentence and decline to find it inappropriate, considering his violent criminal history and the risk he poses of perpetuating the cycle of domestic abuse against A.N.

## I. Trial courts have a broad range of options for sentencing low-level offenders in light of the danger they may pose to the community.

We begin Part I by summarizing the recent reforms to Indiana's criminal-justice system. For sentence-review purposes, we draw two principal conclusions from these reforms: First, sentencing courts should consider the full range of available options, including community-based rehabilitation programs, for defendants who commit low-level offenses but pose little continuing danger to others. Second, to ensure public safety, courts should consider extended jail sentences for low-level offenders with a history of violence who pose a continuing threat to others. Consequently, we will defer to a trial court's considered assessment that a person is too dangerous to receive anything but a lengthy executed sentence.

### A. Indiana's reformed criminal-justice system distinguishes between offenders the community is "mad at" and those the community is "afraid of."

In 2014, when much of the nation was moving in the same direction, Indiana undertook major criminal-justice reforms. The motivations were

varied but significantly driven by the cost of mass incarceration. *See* Drew Kirages, Note, *Reentry Reform in Indiana: HEA 1006 and Its (Much Too Narrow) Focus on Prison Overcrowding*, 49 Ind. L. Rev. 209, 209 (2015). Indeed, from 2000 to 2010, Indiana's spending on prisons had risen by seventy-six percent, as the number of people incarcerated had grown by forty-one percent. Hon. Randall T. Shepard, *The Great Recession as a Catalyst for More Effective Sentencing*, 23 Fed. Sent'g Rep. 146, 146 (2010).

The increase in inmate numbers came largely from imprisoning drug offenders. Michael M. O'Hear, *Mass Incarceration in Three Midwestern States: Origins and Trends*, 47 Val. U. L. Rev. 709, 729, 733 (2013). Prisons are an expensive proposition that became unsustainable as millions of Americans became addicted to opioids. By the 2010s, more than eighty percent of the nation's prisoners had substance-use disorders. Leo Beletsky, et al., *Fatal Re-Entry: Legal and Programmatic Opportunities to Curb Opioid Overdose Among Individuals Newly Released from Incarceration*, 7 Ne. U. L.J. 149, 151 (2015). Simple possession of less than three grams of opioids—potently addictive drugs mass-produced and over-prescribed at unprecedented levels—was punishable by up to three years in the DOC. Ind. Code § 35-48-4-6(a) (2006); I.C. § 35-48-2-4(b) (2013); I.C. § 35-50-2-7(a) (2013); James G. Hodge, et al., *Exploring Legal and Policy Responses to Opioids: America's Worst Public Health Emergency*, 70 S.C. L. Rev. 481, 485–90 (2019).[7]

In Indiana, the General Assembly saw the writing on the wall and took action. The 2014 reforms, largely embodied in House Enrolled Act 1006 (HEA 1006),[8] aimed to "reduce crime by promoting the use of evidence based best practices for rehabilitation of offenders in a community setting." I.C. § 35-32-1-1(5) (2014). The flipside of this coin was to "keep dangerous offenders in prison by avoiding the use of scarce prison space for nonviolent offenders." I.C. § 35-32-1-1(6).

---

[7] Simple possession of up to five grams of opioids today carries a maximum of two and a half years. I.C. § 35-48-4-6(a) (2014); I.C. § 35-50-2-7(b) (2019).

[8] Pub. L. No. 168-2014, 2014 Ind. Acts 2030.

HEA 1006 and subsequent reform measures restructured sentencing, tied probation funding to the development of evidence-based programs for reducing recidivism, and required the detention of most Level 6 felony offenders in local county jails rather than the DOC. Kirages, *supra*, at 218–19, 222. The reforms also resulted in more graduated penalties for drug offenses, depending on the quantity of drugs involved and the presence or absence of enhancing circumstances, such as possession of a firearm. Joel M. Schumm, *Recent Developments in Indiana Criminal Law and Procedure*, 48 Ind. L. Rev. 1241, 1242–43 (2015).

On the ground, these changes meant that most low-level felons, including those who possessed opioids, were no longer eligible for placement in the DOC. *See* I.C. § 35-38-3-3(d) (2015).[9] Instead, they would serve community-based sentences—whether in the county jail, on probation, or under the supervision of a problem-solving court with medically assisted treatment and connection to peer-support groups.[10]

Beyond the response to drug offenses, our criminal-justice overhaul resulted in deinstitutionalization and community-based sentencing for most other low-level felons, including some who had been violent. Persons convicted of various offenses—*e.g.*, strangulation, stalking, and domestic battery with a prior conviction or in the presence of a child—were also now, for the most part, ineligible for placement in the DOC. I.C. § 35-42-2-9(b) (2014); I.C. § 35-45-10-5(a); I.C. §§ 35-42-2-1.3(b)(1), (2). These offenders instead became the responsibility of their local criminal-justice systems.

---

[9] Under a 2022 amendment, low-level felons are eligible for direct commitment to the DOC, although discretion lies with the trial court. Pub. L. No. 45-2022, § 9, 2022 Ind. Acts 393, 402–03 (codified at I.C. § 35-38-3-3(c) (2022)).

[10] At last count, Indiana boasts fifty adult drug courts, twenty-eight veterans' courts, and twenty-one family-recovery courts. Ind. Crim. Justice Inst. & Justice Reinv. Advisory Council, Annual Evaluation: Indiana's Criminal Code Reform 7 (2023), https://www.in.gov/cji/grant-opportunities/files/1006-Report-2023.pdf [https://perma.cc/F8AP-JF26]. The Justice Reinvestment Advisory Council (JRAC) was created in 2015 to assist communities with developing best practices and obtaining grants for recidivism-reduction programs. *See* I.C. § 33-38-9.5-3 (2021).

In considering sentences imposed on such offenders, policymakers described Indiana's "smart-on-crime" reforms with a phrase that captured its two contrasting faces: separating "'the people we're mad at from the people we're afraid of.'" *Dewees v. State*, 180 N.E.3d 261, 266 (Ind. 2022) (quoting Tom Davies, *Ind. House Panel Backs Sentencing Laws Overhaul*, Dubois County Herald (Jan. 17, 2013) (in turn quoting Rep. Greg Steuerwald)). Indeed, many serious offenses involving violence, sex, and drug-dealing received more severe penalties after the overhaul than they had before. *See Schumm*, *supra*, at 1241–42 (explaining that the actual time served could increase for murder and those felonies classified at Levels 1, 3, and 5).

The dichotomy between "mad at" and "afraid of" has helped local justice professionals understand the need to prioritize the use of a community's most expensive and scarce resource—jail beds—for people who present credible and continuing threats to public safety. But the overriding message remained the promotion of public safety.

## B. Trial courts should consider the full range of sentencing options for offenders who pose a continuing danger to the community.

The distinction between offenders the community is "mad at" or "afraid of" influences our approach to sentence review, including the review of lower-level offenses.

Most crimes are, like the offenses at issue here, misdemeanors or low-level felonies. In 2023, 70.9 percent of new felony filings were for Level 6 felonies. Ind. Crim. Justice Inst. & Justice Reinv. Advisory Council, Annual Evaluation: Indiana's Criminal Code Reform 17 (2023), https://www.in.gov/cji/grant-opportunities/files/1006-Report-2023.pdf [https://perma.cc/F8AP-JF26] (Annual Evaluation). Because persons convicted of these crimes will often serve out their sentences at the local level (rather than at the DOC), a trial judge must usually rely on local resources. The county jail, the probation department, the community-corrections office, the community mental-health center, problem-solving

courts, and no-contact orders make up the primary tools available for trial courts to craft a community-based sentence. Any one tool, or some combination, may be an appropriate sentencing option in a particular case. Knowing which tools, or combination of tools, to employ is a skill that our trial judges must develop—and have developed—to ensure public safety and public trust. Our respect for the trial courts' local knowledge, skill, familiarity with their own cases, and primary role as sentencers remains paramount.

At the same time, we have a responsibility to ensure a degree of uniformity. Across our state, ninety-one county-based systems[11] operate on the criminal-justice frontlines relatively independent of each other. But trial judges in each county impose sentences for the same classes of crime, within the same penalty ranges, and with opportunities to develop the same community-based programs outside of jail. These programs are even more important to use wisely, considering the expense and difficulty of holding offenders in county jails. The latter are "not intended to be 'small prisons,'" yet many operate beyond their capacity. Bre Robinson, Note, *Who Are We Afraid of? Indiana's Criminal Reform and How It Fails to Address Those with Mental Illness and Substance Use Disorder*, 54 Ind. L. Rev. 635, 640–42 (2021); *see also* Annual Evaluation, *supra*, at 53–54. We thus expect the trial courts in each county to take advantage of the full range of options for dealing with offenders who are not destined for DOC custody. *Cf. Kellams v. State*, 198 N.E.3d 375, 376 (Ind. 2022) (Rush, C.J., dissenting from denial of transfer) (noting the "justice-by-geography anomaly" that some counties still lack problem-solving courts).

One of the most important tasks for a trial judge is to determine which low-level offenders are **not** good candidates for community corrections or problem-solving courts. Our standard of review offers deference to a trial court's considered decision on this score, as on all sentencing matters. Of course, our criminal code does not require a trial judge to use the same

---

[11] Ohio and Switzerland Counties operate largely as one system, sharing a judge, a jail, and other critical personnel and infrastructure.

degree of formality in imposing a penalty for a misdemeanor as for a felony. *See* I.C. § 35-38-1-1.3 (2014) (requiring courts to issue statements only in felony cases when explaining any deviation from the advisory sentence). Still, it is important for a reviewing court to consider all the facts that confronted the sentencing judge. After all, the General Assembly intends trial judges to enjoy "maximum discretion to impose sentences based on a consideration of all the circumstances related to the offense." I.C. § 35-32-1-1(7). When determining whether a misdemeanant's lengthy sentence of imprisonment may be inappropriate, we find it helpful when trial courts, as here, explain their sentencing considerations in some detail on the record.

Given the context and general principles described above, we can properly frame the issue that lay before the trial judge in this case: How does a judge craft an appropriate sentence when a repeat misdemeanor offender has been undeterred by DOC placement, has demonstrated unwillingness to comply with a no-contact order, has threatened before to kill the victim and her family, and has a history of violent offenses? In such a case, it might well be appropriate to craft a sentence that incapacitates the offender from harming others for as long as possible. And it would behoove us to defer to a trial court's sound discretion in imposing such a sentence on a dangerous, violent offender.

## II. A defendant may seek to show that their sentence is inappropriate in light of either the nature of their offense or their character.

Before returning to the facts of Lane's appeal, we lay out one additional clarification of our standard of review in 7(B) claims.

In *Connor v. State*, the Court of Appeals explained that the two prongs of Appellate Rule 7(B)—the nature of the offense and the character of the offender—are "separate inquiries to ultimately be balanced in determining whether a sentence is inappropriate." 58 N.E.3d 215, 218 (Ind. Ct. App. 2016). Reviewing courts "must *consider*" both factors, but the defendant need not "necessarily *prove*" that the sentence is inappropriate

on both counts. *Id.* at 219. Revision may be warranted "where only one of the prongs weighs heavily in favor" of the defendant. *Id.* By contrast, the panel in *Davis v. State* held that both "conditions" must be satisfied. 173 N.E.3d 700, 706 (Ind. Ct. App. 2021).

We adopt the *Connor* court's understanding as a faithful expression of the flexibility of our 7(B) case-law. *See, e.g., State v. Stidham*, 157 N.E.3d 1185, 1195 (Ind. 2020) (calling the claimant's crimes "horrific" yet granting relief based on his youth and "positive steps toward rehabilitation" before conviction); *Livingston v. State*, 113 N.E.3d 611, 614 (Ind. 2018) (granting relief to a defendant who, despite the "serious" drug offenses involved, had "dedicated her time" and resources to "helping others who suffer from addiction"); *Isom v. State*, 31 N.E.3d 469, 494 (Ind. 2015) (deciding that the nature of the claimant's offenses "far outweigh[ed] his otherwise favorable character"); *Carpenter v. State*, 950 N.E.2d 719, 721 (Ind. 2011) (taking the "adverse character of the offender and the unaggravated nature of the offense as a whole" in granting relief).

As the *Connor* court appreciated, "7(B) review is a holistic approach." 58 N.E.3d at 219. We assess a sentence in light of the whole picture before us. Allowing a strong showing on one prong to outweigh a weak showing on the other promotes the ideal of "similar sentences" for "perpetrators committing the same acts who have the same backgrounds." *See Serino*, 798 N.E.2d at 854. We reiterate, however, that, to the extent the evidence on one prong militates against relief, a claim based on the other prong must be all the stronger to justify relief. *See Connor*, 58 N.E.3d at 220.

## III. The sentence here was not inappropriate.

The principles announced above inform our evaluation of Lane's 3,000-day sentence, which we ultimately affirm. In short, Lane's crimes and character indicate that he poses a continuing danger of restarting a cycle of physical and emotional abuse towards A.N. We defer to the trial court's decision that a lengthy term of imprisonment was warranted for the safety of A.N. and the community.

We begin with Lane's character. Unfortunately, his record of seven felony convictions demonstrates a highly concerning disregard for the law and a risk to the public. His varied rap sheet includes a sex crime, drug dealing, and domestic violence against A.N. Moreover, Lane committed his invasions of privacy while in prison, indicating an ongoing and stubborn willingness to break the law. At the sentencing hearing, A.N. laid out a history of intimidation and violence—a history that includes a threat to kill A.N. and her family, and Lane giving his own mother a concussion as his daughter watched. Because the evidence of Lane's character is so unfavorable, only a highly persuasive claim based on the nature of his offenses could render his sentence inappropriate.

A considerable amount of evidence was placed before the trial court concerning the nature of the offenses. First, we consider the letters themselves, then the context in which they were written.

We acknowledge that a letter is not the most intrusive way of violating a no-contact order. We note, too, that Lane's letters were not openly threatening and often discussed run-of-the-mill family matters. However, the series of letters also contained a noticeable oscillation in tone. They began with the aspiration to be released on Valentine's Day, assurances that Lane would take "full responsibility" towards the children, several apologies, and a realization that "[w]e're all God's creatures." Ex., pp. 9, 11. But concerning remarks started to creep in over time, with Lane reminding A.N. that he was "not going anywhere," telling her he hoped she could "find it within" herself "to make it as peaceful as can be," and asking her not to keep the children from him out of anger or resentment. *Id.* at 12, 14, 15. Eventually, Lane openly criticized A.N., telling her that he'd "forgiven" her "for everything besides the bad mouthing" him "in front of the kids" and referring to her as "an emotionally and psychologically abusive person and when drunk, physical." *Id.* at 15–16. The later letters then expressed love for others and gratitude to A.N. *Id.* at 16–17.

A.N. testified to the context of these letters at the sentencing hearing. She explained that, after being "entangled" with Lane for eighteen years, she was facing her "biggest battle" with him. Tr. Vol. II, p. 41. Lane had in

the past attacked her, told her he would always be watching her, and twisted words from the Bible to suit himself. While Lane had been looking ahead to release from prison, he knew he would have "nowhere to go." *Id.* at 41. The letters set out "his expectations of how things would be" once he got out, including what A.N. "needed to be doing," making her feel like everything was her "fault." *Id.* She described Lane as "his family's dictator." *Id.* at 42. She feared "the same exact cycle" repeating "again and again." *Id.* at 44.

The trial court carefully parsed the facts and circumstances before determining that Lane's offenses might be an exercise in regaining control over A.N. In the trial court's own words, what appeared superficially to be "very 'nice talking'" in Lane's letters could have been an effort "to lure the victim back in." *Id.* at 56. On the other hand, the trial court allowed A.N.'s responses to Lane's letters to alleviate his blame somewhat. Overall, however, the length of Lane's sentence indicates to us that the trial court deemed him to be a person whom the community may justly be "afraid of."

We agree with that assessment. As the State argued at the sentencing hearing, Lane's conduct is consistent with aspects of the "Power and Control Wheel," a representation of common, yet somewhat counterintuitive, patterns of domestic abuse developed by researchers at the Domestic Abuse Intervention Project. *See* Debra Pogrund Stark & Jessica Choplin, *Seeing the Wrecking Ball in Motion: Ex Parte Protection Orders and the Realities of Domestic Violence*, 32 Wis. J. L. Gender & Soc'y 13, 24–25 (2017). Even more so, Lane's conduct aligns with the often-observed "Cycle of Violence." *See id.* at 25. Typically, as abusers increase their control over their victims, the latter "develop feelings of love and loyalty," as well as "extreme dependence," towards them. *Id.* at 26. Once physical violence begins, the abuser uses emotional abuse "calculated to demean the targets," leading them to "question themselves" and "wonder if they were to blame for their partner's statements and actions." *Id.* After each violent incident, the abuser follows up with a "'honeymoon' period" of "apologies and promises." *Id.* Critically, even after victims achieve the difficult task of getting away, abusers "do not stop trying to control" their victims, but try to get them back by "promising to change" or coercing a

return to the relationship. *Id.* It takes an average of seven attempts to successfully leave a domestic abuser. *Id.* Victims suffer the "quandary" of not knowing whether it is safer to stay or to go as abusers typically threaten their victims—even threatening to kill them and their children. *Id.* at 27.

Understood in light of the cycle of violence, the apologies, promises, criticism, and blame-shifting in Lane's letters demonstrate his intent to reestablish his control of A.N.'s life. The no-contact order was supposed to make this impossible. As Judge Kenworthy explained in her dissent in this case, Lane's strategy initially worked in terms of getting A.N. to re-engage with him. *Lane*, 211 N.E.3d at 560. But A.N. managed to break the cycle. Much is at stake in ensuring that it never restarts. In A.N.'s words, "I fear that if he gets out, not only will someone get hurt, but it could possibly be much worse." Tr. Vol. II, p. 43.

The trial court was faced, then, with sentencing Lane on offenses committed by a habitually violent, repeat felon, while serving a prison sentence, against the same victim whom he had been imprisoned for battering, in contravention of a no-contact order issued by the same sentencing judge to prevent the continuation of his violence and abuse. Because the current offenses were misdemeanors, the trial court did not have the option of lengthy concurrent sentences. The trial court settled instead on less-than-maximum sentences for each of the ten letters charged, which could lawfully run consecutively without regard to whether they constituted a "single episode" of criminal conduct (which we doubt in any case). *See Fix v. State*, 186 N.E.3d 1134, 1144 (Ind. 2022) (focusing the "single episode" analysis on "the simultaneous and contemporaneous nature of the crimes, if any") (internal quotation marks and citation omitted); *Dunn v. State*, 900 N.E.2d 1291, 1292 (Ind. Ct. App. 2009) (holding that a former version of code section 35-50-1-2(c), the "single episode" statute, did not limit consecutive misdemeanor-only sentences). Given the options before the trial court to protect A.N. and others, it was not inappropriate to impose the sentence here, thereby incapacitating Lane from perpetuating the cycle of violence and abuse.

In coming to this conclusion, we note the contrasts between this case and another, *Livingston v. State*, which is emblematic of our 7(B) jurisprudence.

In *Livingston*, the defendant was charged with two Class A felony counts of dealing methamphetamine and various possession offenses, as well as with being a habitual substance offender. 113 N.E.3d at 612. While out on bond, the defendant lived in the Bliss House substance-abuse recovery home before moving into its transitional house. *Id.* She became chair of Bliss House's alumni community and served on the Bliss House committee. *Id.* at 612–13. She started both a business and a recovery home for women. *Id.* at 613. She voluntarily placed herself in a community-corrections program and tested negative on all her random drug screens. *Id.* She eventually pled guilty as charged. *Id.* At the sentencing hearing, she presented supportive testimony from her arresting officer and a community-corrections manager. *Id.* Nevertheless, the trial court imposed a thirty-year sentence. *Id.* For our part, we recognized that this was an "exceptional case," that the defendant had committed no offenses since her arrest, and that she had "dedicated her time to becoming a productive member of her community and helping others who suffer from addiction." *Id.* at 614. We revised the sentence to the mandatory minimum twenty-three years and directed the remaining time to be served in community corrections. *Id.*

Unlike the defendant in *Livingston*, Lane has continued to commit offenses even while in prison, rather than demonstrating he is becoming a productive and law-abiding citizen. The evidence suggests that he may revert to an established pattern of domestic abuse. Lane does not present an "exceptional case" calling for revision of the trial court's sentence.

Finally, we are aware that such a long aggregate sentence for misdemeanors as Lane's is uncommon. We are conscious, too, that the proposal and adoption in 1970 of our constitutional review-and-revise power was inspired by the "'efficacious'" use made of the revising power by the English Court of Criminal Appeals. *McCullough v. State*, 900 N.E.2d 745, 748 (Ind. 2009) (quoting Text of the ABA Model State Judicial Article, *reprinted in* 47 J. Am. Judicature Soc'y 6, 9 (June 1963)); *see also* Hon.

Randall T. Shepard, *Robust Appellate Review of Sentences: Just How British Is Indiana?*, 93 Marq. L. Rev. 671, 672 (2009). As the Indiana Public Defender Council (IPDC) explains in its informative amicus brief, the English court at that time recognized the principle that concurrent sentences were required in the case of "a series of related and similar offences committed closely together in time." IPDC Amicus Br. at 7 (quoting D.A. Thomas, *Appellate Review of Sentences and the Development of Sentencing Policy: The English Experience*, 20 Ala. L. Rev. 193, 202–03 (1968)). Furthermore, the English court indicated that "completely separate offenses" should not be punished "far in excess" of the appropriate sentence for the most serious individual offense. *Id.* (quoting same).

Admittedly, Lane's sentence does not follow these principles—although we note that Lane was neither convicted for every letter he sent nor sentenced to the maximum available on each conviction. At any rate, we decline to adopt hard-and-fast directives under Rule 7(B) for sentences on multiple offenses. As we have explained, the essence of today's criminal-justice system in Indiana is to distinguish dangerous, violent offenders from the rest and to provide for sentences that reflect all the pertinent circumstances. We assess an aggregate sentence against the myriad factors appearing in the individual case. *See Cardwell*, 895 N.E.2d at 1224.

Here, Lane committed repeated, similar offenses. But that is not all. The offenses reflected his longstanding pattern of domestic abuse and he failed to stop committing crimes against the same victim despite imprisonment. Sometimes, as in this case, there is good justification for a sentence that looks at first glance like an outlier.

## Conclusion

The trial court carefully considered all the circumstances and determined that Lane's crimes and character warranted a lengthy aggregate sentence for his repeated misdemeanors. The sentence is consistent with the aim of Indiana's criminal-justice system to separate dangerous, violent offenders from the community to protect public safety.

We defer to the trial court's assessment of the options before it in this case and, accordingly, affirm the sentence.

Rush, C.J., and Slaughter, J., concur.
Molter, J., dissents with separate opinion in which Massa, J., joins.

ATTORNEY FOR APPELLANT
Daniel A. Dixon
Lawrence County Public Defender Agency
Bedford, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Attorney General of Indiana

Steven J. Hosler
Ellen H. Meilaender
Angela Sanchez
Office of the Indiana Attorney General
Indianapolis, Indiana

AMICUS CURIAE INDIANA PUBLIC DEFENDER COUNCIL
Bernice Corley, Executive Director
Suzy St. John, Staff Attorney
Indiana Public Defender Council
Indianapolis, Indiana

## Molter, J., dissenting.

I respectfully dissent from the Court's decision to decline any Appellate Rule 7(B) relief. Leading up to Part III, the Court's opinion eloquently explains Rule 7(B)'s constitutional grounding, history, and guiding principles. And Part III helpfully identifies guideposts for misdemeanor sentencing: (1) related and similar misdemeanor offenses committed close in time generally warrant concurrent rather than consecutive sentences, and (2) separate misdemeanor offenses generally should not be punished far in excess of the appropriate sentence for the most serious individual offense. I agree with much of that discussion, but on balance, the considerations the Court outlines compel revising the sentence here.

To be sure, Lane's character does not warrant any revision, but the nature of his offense does. As Part III acknowledges, "a letter is not the most intrusive way of violating a no-contact order," "Lane's letters were not openly threatening and often discussed run-of-the-mill family matters," and "such a long aggregate sentence for misdemeanors as Lane's is uncommon." *Ante*, at 13, 16.

By any measure, Lane's sentence is an extreme outlier. For the underlying Level 6 felony battery that led to the no-contact order, Lane received a two-year suspended sentence (plus one year of probation). So his 3,000-day executed sentence for sending nonthreatening letters is more than four times longer than his suspended sentence for battery. That is on top of the trial court revoking the suspended sentence and requiring that it be executed.

If instead of sending nonthreatening letters, Lane had committed battery resulting in moderate bodily injury, his maximum sentence would be two and a half years with an advisory sentence of one year. Ind. Code § 35-42-2-1.3(b)(1), (b)(3), (b)(7) (battery provisions); *id*. § 35-50-2-7(b) (Level 6 felony sentencing). And as the Court of Appeals' majority opinion explained, the sentence here is much longer than other sentences that panel recently approved for more egregious conduct, including aiding the rape of a child and Level 6 felony domestic violence resulting in injury. *Lane v. State*, 211 N.E.3d 551, 556 n.4 (Ind. Ct. App. 2023). The State

concedes it is unaware of any sentences in other cases reflecting that Lane's sentence is not an outlier.

Nevertheless, the Court concludes no relief is warranted because the trial court's sentence was a carefully considered one, and Lane's letters present the risks reflected in the Power and Control Wheel. Those are certainly compelling reasons not to reduce Lane's sentence too far. But the nature of the offense still warrants appellate relief to "leaven" the outlier sentence. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).

Mindful that for sentencing there is no one "right answer in any given case," I would revise Lane's sentence for sending the nonthreatening letters at least to the extent the sentence would not exceed the two-and-a-half-year maximum sentence for battery resulting in moderate bodily injury. *State v. Stidham*, 157 N.E.3d 1185, 1197 (Ind. 2020) (quotations omitted).

Massa, J., joins.